IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

UNITED STATES OF AMERICA,       )
                                )
            v.                  )
                                )    1:06cr9(JCC)
SABRI BENKAHLA,                 )
                                )
        Defendant.              )

## **M E M O R A N D U M   O P I N I O N**

Defendant, Sabri Benkahla, stands before this Court charged with two counts of making false declarations before a grand jury, in violation of 18 U.S.C. § 1623, and one count of obstruction of justice, in violation of 18 U.S.C. § 1503. Defendant has filed numerous pretrial motions, which are currently before the Court.

## I.  Background

On August 26, 2004, Defendant testified before a federal grand jury regarding his possible participation in a jihad training camp and use of automatic weapons and rocket propelled grenades ("RPGs").[1]  Defendant's testimony centered around a trip that he took to Pakistan and possibly Afghanistan during the summer of 1999, as well as email correspondence referring to the trip.  Defendant testified that during his 1999 trip he did not participate in any training relevant to combat,

---

[1]Pursuant to 18 U.S.C. § 6003, Judge Hilton entered an Order on April 7, 2004 compelling Defendant's testimony in the grand jury investigation and granting him use immunity.

see any training relevant to violent jihad, see any training
relevant to combat, handle a firearm or an explosive device, fire
a firearm or an explosive device, or see anyone else fire a
firearm or an explosive device.  During the same grand jury
appearance, Defendant also testified that he had not ever fired
an AK-47 or a RPG.  The Government questioned Defendant about two
emails he had sent referring to "studying in Afghan" and
traveling to a "place far, far away," which was "top secret
info."  Defendant testified that these emails did not refer to
jihad training in Afghanistan.  The Government also questioned
Defendant about a third email in which Defendant referred to an
individual named Haroon.  Defendant testified that he could not
identify Haroon or the recipient of the email.

On November 16, 2004, Defendant testified before the
grand jury for a second time.  During this appearance, Defendant
testified that he saw no one other than Pakistani Army soldiers
carrying firearms during his trip in the summer of 1999, that he
had never fired an AK-47, that he had never fired an automatic
weapon of any kind, and that he had never fired a RPG.  Because
Defendant first traveled from the United States to Great Britain
and then purchased a ticket to Pakistan, the Government
questioned Defendant about his reasons for doing so.  Defendant
testified that he was not sure whether he would go to Pakistan
until he arrived in London and that he decided to make the trip

after meeting, for the first time, an individual in Great Britain who agreed to show him around Pakistan.

Defendant's August 26, 2004 testimony forms the basis for Count I of the indictment, and Defendant's November 16, 2004 testimony forms the basis for Count II.  Count III, the obstruction of justice charge, is based on both occasions. Defendant has filed a variety of pretrial motions, which are currently before the Court.

## II.  Analysis

A.  Motions to Dismiss

### 1.  Collateral Estoppel

Defendant's first motion seeks to preclude the Government from relitigating issues that he claims were resolved against the Government during his prior prosecution.  In 2003, Defendant was arrested in Saudi Arabia, flown back to the United States, and prosecuted in this district for willfully supplying and attempting to supply services to the Taliban, in violation of 50 U.S.C. § 1705, the penalty provision for violations of the International Emergency Economic Sanctions Act ("IEEPA"). Defendant was also charged with using a firearm in furtherance of the alleged IEEPA violation, in violation of 18 U.S.C. § 924(c). The charges were based on:  1) Defendant's alleged participation, during his trip to South Asia in the summer of 1999, in a jihad training camp operating by the Pakistani terrorist group Lashkar-

e-Taiba ("LET") in the territory of Afghanistan controlled by the Taliban; and 2) Defendant's alleged use of firearms in the course of this participation.

At the time of Defendant's trip to South Asia, LET had not yet been officially designated a terrorist organization, and provision of services to LET had not yet been banned. Pursuant to President Clinton's Executive Order of July 4, 1999, however, the provision of services to the Taliban or to the territory of Afghanistan controlled by the Taliban constituted a violation of IEEPA. *See* Exec. Order No. 13129. *See also* 31 C.F.R. § 545.204. Accordingly, proof that Defendant participated in a LET jihad training camp was insufficient by itself to convict Defendant of either charge. In the absence of evidence that Defendant provided services directly to the Taliban, the Government was required to establish that Defendant's combat training occurred within the territory of Afghanistan controlled by the Taliban.

In March 2004, Defendant waived a jury trial and was tried on the above charges by Judge Leonie M. Brinkema. At trial, the Government presented the testimony of four witnesses. While each witness testified, to some extent, that Defendant had participated in a jihad training camp, only one of the four witnesses, Ibrahim Al-Hamdi, stated that Defendant's activities occurred in Taliban-controlled territory. At the conclusion of the trial, Judge Brinkema made the following findings:

-4-

> Mr. Santora [another Government witness] doesn't have
> any idea where Mr. Benkahla fired weapons, but he, I
> think, is a good witness, and I would find based on his
> testimony that at some point, Mr. Benkahla has fired an
> automatic AK-47 and RPG, but that's, of course, not
> what's charged specifically in this case.  The firing
> of those weapons is a crime only if it's in furtherance
> of a crime of violence and the underlying crime of
> violence is providing support to the Taliban, so that
> Court 6 [the IEEPA charge] is the essential count in
> this case.
>
> And so we come back to the question of is there
> sufficient evidence to prove beyond a reasonable doubt
> that Mr. Benkahla either supplied or attempted to
> supply material support to the Taliban.
>
> At best in my view, the government's evidence
> establishes that Mr. Benkahla was in an LET training
> camp possibly in Afghanistan and may even have fired a
> weapon in the camp.  The only evidence in this case of
> being at a front line or engaging in any kind of
> military action comes from Al-Hamdi, and I find that
> Al-Hamdi's description of that is simply not
> believable.

(Tr. of Mar. 9, 2004 Hr'g at 5-6).  Judge Brinkema went on to

address the email in which Defendant stated to an individual

named Allison that he was traveling to a "place far, far away,"

which was "top secret info," and the email in which Defendant

told a reputed terrorist that he had been "studying in Afghan":

> Now, I tell you the strongest piece of evidence the
> government has in this case, I think are the two
> emails, and the email to Allison is equally consistent
> in my view with going to a training camp in Pakistan as
> it would be to go to Afghanistan, so I don't think that
> answers the question.
>
> . . .
>
> The word "study" is different from the word "train."
> Now, I recognize that it could have been code, it could
> have been meant that way, but study is study, train is

> train, and he does use those words differently at the
> latter part of that email.
>
> I don't think in terms of proof beyond a reasonable
> doubt that [the email] is sufficient evidence to
> establish beyond a reasonable doubt that Mr. Benkahla
> was actually in Afghanistan, in a training camp
> fighting on behalf of the Taliban - eventually fighting
> on behalf of the Taliban.

(*Id.* at 7-8.)  Hence, Judge Brinkema found that the Government

had not proven, beyond a reasonable doubt, that Defendant

provided services to the Taliban or to the territory of

Afghanistan controlled by the Taliban.

In *Ashe v. Swenson*, 397 U.S. 436 (1970), the Supreme

Court held that the doctrine of collateral estoppel is embodied

within the Fifth Amendment guarantee against double jeopardy.

*Id.* at 445-46.  Thus, "when an issue of ultimate fact has once

been determined by a valid and final judgment, that issue cannot

again be litigated between the same parties in any future

lawsuit."  *Id.* at 443.  An issue is precluded only where: 1) the

issue in question is identical to the previous issue; 2) the

issue was actually determined in the prior adjudication; 3) the

issue was necessarily decided in the earlier proceeding; 4) the

resulting judgment settling the issue was final and valid; and 5)

the parties had a full and fair opportunity to litigate the issue

in the prior proceeding.  *United States v. Fiel*, 35 F.3d 997,

1006 (4th Cir. 1994).  Each of these five elements must be

resolved in the movant's favor before an issue will be precluded.

*See United States v. Ruhbayan*, 325 F.3d 197, 202 (4th Cir. 2003).
Furthermore, "[r]easonable doubt as to what was decided by a
prior judgment should be resolved against using it as an
estoppel."  *Id.* at 203 (internal citation omitted; alteration in
original).

          In this case, the Court needs not go any further than
the first element to address the majority of Defendant's claims.
To be sure, in order to prove the falsity of several of
Defendant's statements before the grand jury, the Government will
have to establish that Defendant attended a jihad training camp
or fired an automatic weapon or RPG.  Nevertheless, this case
does not involve issues that are identical to the previous
prosecution.

          The previous case required the Government to prove that
Defendant's combat training activities occurred within the
Taliban-controlled regions of Afghanistan.  It was this element
of the prosecution that Judge Brinkema found deficient.  In the
present case, the location of Defendant's combat training
activities is largely irrelevant.  Defendant testified before the
grand jury that he did not see or participate in any combat
training during his trip to South Asia in the summer of 1999, and
that he did not fire a firearm or an explosive device during this
time period.  To prove the falsity of this testimony, the
Government must establish that Defendant attended a combat

-7-

training camp, witnessed jihad training, or fired a firearm or explosive device during the relevant time period.  The question of "where" was only relevant to the previous prosecution; it is the question of "when" that is of the utmost relevance in the instant case.  In other words, the issues are not identical.

Furthermore, if the issues in the previous case are not identical to those in the instant case, those issues could not have been actually determined.  As the above-quoted findings show, Judge Brinkema found only that the Government failed to prove that Defendant attended a jihad training camp in Afghanistan.  She did not find, as a general matter, that the Government failed to prove that Defendant attended a jihad training camp.  The Government is therefore entitled to prove that Defendant participated in a combat training camp, witnessed training relevant to combat and violent jihad, fired weapons, and engaged in other related conduct during his 1999 trip.

To provide the parties with clear guidance, the Court will list the portions of Defendant's grand jury testimony that are susceptible to proof of falsity in this action.  Starting with Defendant's first grand jury appearance, those statements are as follows:

Q: Did you participate in any training relevant to combat at any time during your trip to Pakistan or Afghanistan in the summer of 1999?

A: No, I did not.

Q: Did you see any training relevant to violent jihad at any time during your trip to Pakistan or Afghanistan--

A: No, I did not.

Q: --in the summer of 1999?  Let me finish the question.  Is the answer to that question no?

A: Yes, it is.

Q: Did you see any training relevant to combat at any time during your trip to Pakistan or Afghanistan in the summer of 1999?

. . .

A: No.

Q: Did you handle a firearm at any time during your trip to Pakistan or Afghanistan in the summer of 1999?

A: No, I did not.

Q: Did you handle an explosive device at any time during your trip to Pakistan or Afghanistan in the summer of 1999?

A: No.

Q: Did you fire a firearm at any time during your trip to Pakistan or Afghanistan in the summer of 1999?

A: No, I did not.

Q: Did you fire an explosive device at any time during your trip to Pakistan or Afghanistan in the summer of 1999?

A: No, I did not. . . .

. . .

Q: Did you see anyone - all right, Mr. Benkahla, did you see anyone fire a firearm at any time during your trip to Pakistan or Afghanistan in the summer of 1999?

A: Not to my recollection, no.  And I answered that.

-9-

Q: Could -- is the answer to that question no?

A: To my recollection, I never saw anybody fire any firearms.  I saw people maybe carrying arms, but I never saw them firing arms.

Q: Okay.  During the entire trip of the summer of 1999?

A: That's what I recall.

Q: All right.  Did you see anyone fire an explosive device at any time during your trip to Pakistan or Afghanistan in the summer of 1999?

A: No.

Q: All right.  Now Mr. Benkahla, have you yourself ever fired at any time, not just in the summer of 1999, but at any time, an AK-47 style rifle?

A: I fired an M-16 once when I was in ROTC training at George Mason.  I never fired an AK-47.

Q: Have you yourself ever fired a rocket propelled grenade?

A: No, I did not.

. . .

Q: [Y]ou have before you a, a email. . . . dated June 10th, 2000. . . .  And you received and saved this email.  It's from myunus@talk21.com.  Who is that person?

A: I'm not sure.

Q: Now, in this email, it also mentions at the bottom "salaams to Haroon."  Who was the Haroon that's mentioned by you and myunus@talk21.com in this email?

A: This is my writing, or is he writing it to me?

Q: Whether you sent it or whether you received it, do you know who the Haroon is in this email?

A: No.

> Grand Juror: Okay.  And who did you say ["]myunus["] was?
>
> A: I wasn't sure who he was.
>
> . . .
>
> Grand Juror: Okay.  On the next page, right before you close, where it says ["]your brother Sabri["]--
>
> A: Yes.
>
> Grand Juror: --could you please read the last sentence of your paragraph?
>
> A: "Please stay in touch and please give my salem to Haroon."
>
> . . .
>
> Grand Juror: --what is this "salem"?  Is it a prayer or thoughts -- greetings?
>
> A: It's a greeting.  Like say, say hi, hi to Haroon. But I'm not sure who this "yunis" is and which Haroon this is.  So maybe you can write or they can write to the -- this person, and find out who he is, and can tell me his full name who he is.

(Indictment at 3-5, 7-8 (internal citations omitted.).  Likewise, the Government is entitled to establish the falsity of the following statements from Defendant's second grand jury appearance:

> Q: Right. So aside from Pakistani Army soldiers, did you see anybody carrying arms besides people walking along in the village carrying arms?
>
> A: I don't recall, no.
>
> Q: Okay.  Have you ever fired a rifle that may not have been an AK-47 rifle but was an AK-47 style rifle, besides the M-16 you talked about?
>
> A: During ROTC training?

Q: At any time.

A: I don't recall ever firing anything like an AK-47.

Q: Okay, have you ever fired an automatic weapon of any kind?

. . .

A: No.

Q: Have you ever handled a rocket-propelled grenade?

A: No.

Q: Well if you were telling Allison you were going to go someplace secret, meaning Pakistan, why didn't you buy a ticket to Pakistan from the U.S. instead of going to London and buying another ticket, London to Pakistan from London?

A: Like I said, I wasn't sure if I was going to Pakistan or not.  I just had it in my mind that I wanted to visit Pakistan.  I knew a lot of friends in Britain that were from Pakistan.  This email, in general, I was trying to be funny and I wasn't you know, a lot of it's in joking context.

Q: How was it that the person you ended up going with was somebody you'd never met before, this Abdellah?

A: Because he was going there.  The other ones weren't leaving.  My friends that I did know weren't going there.  I mean, he spent the night at the mosque with me for a couple of days, so --

Q: And he just agreed to show you around Pakistan?

A: Well, he told -- I said, like, I was thinking about going to Pakistan.  He said, "Well, I'm leaving to Pakistan," I forget, in a week or whatever, "if you want to come with me, you know, I'll show you around." I said okay.

(Indictment at 11-12 (internal citations omitted).)

However, the collateral estoppel rule does preclude the Government from attempting to establish the falsity of several other statements cited in the indictment.  First, during Defendant's initial grand jury appearance, the Government referenced Defendant's email to an individual named Allison, in which Defendant stated that he was traveling to "a place far, far away, sorry, it's top secret info, can't tell you where it is over the internet."  The Government asked Defendant if he was referring to Afghanistan or any place in Afghanistan, and Defendant replied in the negative.  (Indictment at 3.)  Second, during the same appearance, the Government questioned Defendant about a second email in which Defendant stated, "I have done some studying in Afghan for only a short period."  Defendant testified in response that he had not been to jihad training in Afghanistan, that his email was intended only to convey a false impression that he had participated in jihad training in Afghanistan, and that the "studying" to which he referred had actually been "cultural studies."  (Indictment at 6-7.)

With respect to these statements, Defendant's destination during his 1999 trip and the location of Defendant's alleged jihad training are decidedly relevant.  In other words, the Government would be unable to prove that the above statements were false without delving into issues that are identical to the issues in the previous trial, *viz*, whether Defendant traveled to

-13-

Afghanistan and whether he participated in a jihad training camp in Afghanistan.  These issues were actually litigated in the prior proceeding and were necessary to Judge Brinkema's decision. Moreover, Judge Brinkema's acquittal of Defendant was undoubtedly a final and valid judgment, and there is nothing to indicate that the Government's opportunity to litigate the issue was less than full and fair.  Accordingly, while the majority of Defendant's grand jury testimony is susceptible to proof of falsity, the Government may not obtain a conviction by proving the falsity of Defendant's testimony about the above two emails.

### 2.  Misuse of the Grand Jury

Defendant also alleges that the grand jury's investigation was a mere pretext to lay the groundwork for a perjury indictment.  Defendant argues that hailing him before the grand jury to establish the foundation for a perjury conviction was an improper purpose for the grand jury. *See United States v. Under Seal*, 714 F.2d 347, 349 (4th Cir. 1983) ("[P]ractices which do not aid the grand jury in its quest for information bearing on the decision to indict are forbidden.").  As such, Defendant claims that his testimony was immaterial to a grand jury investigation and cannot form the basis for a false declaration charge.  *See Brown v. United States*, 245 F.2d 549, 554 (8th Cir. 1957) (holding that a defendant's false grand jury testimony was insufficient to establish perjury where the defendant was called

-14-

before the grand jury for the mere purpose of laying the foundation for a perjury prosecution; such testimony was immaterial to the grand jury's purpose).

Defendant cites several circumstances in support of his theory.  He notes that the Assistant United States Attorneys who questioned him before the grand jury were the same individuals who prosecuted him in 2004 and that he was first called before the grand jury only one month after his acquittal.  Defendant also suggests that the Government knew what his testimony would be when it called him before the grand jury.  He states that Government agents debriefed him for several hours before his first grand jury testimony, and that he was asked the same questions at both grand jury appearances.

In order to convict Defendant of Counts I and II, the Government must establish, *inter alia*, "that the subject matter of the testimony was material to the grand jury's investigation." *United States v. Sarihifard*, 155 F.3d 301, 306 (4th Cir. 1998). A finding of materiality is appropriate "if [the testimony] is capable of influencing the fact finder's determinations"; it is irrelevant whether the fact finder was actually influenced by the false testimony.  *Id.* at 306-07.  Defendant's argument is essentially that the Government cannot prove the materiality element of these charges.  The Court cannot say, however, that

Defendant's testimony was immaterial to a grand jury investigation.

In the words of the Supreme Court, "[t]raditionally the grand jury has been accorded wide latitude to inquire into violations of criminal law. . . .  It deliberates in secret and may determine alone the course of its inquiry." *United States v. Calandra*, 414 U.S. 338, 343 (1974).  Further, "[a] grand jury investigation is not fully carried out until every available clue has been run down and all witnesses examined in every proper way to find if a crime has been committed."  *Id.* at 344 (internal quotation marks and citation omitted).  According to the present indictment, the grand jury was conducting an investigation into the participation in and facilitation of jihad training camps in Afghanistan and Pakistan run by LET and other jihad organizations espousing hatred for and violence toward the United States and countries with which the United States is at peace.  The Government submits that Defendant was called before the grand jury to identify individuals who shared an ideology that espoused the use of violence against the United States and who undertook combat training in furtherance of this end.  To this extent, Defendant's answers to the questions posed to him before the grand jury were certainly "capable of influencing the fact finder's determinations."  *Sarihifard*, 155 F.3d at 306.

The Government also points out that, in the course of this investigation, it has charged several individuals in this Court with various degrees of involvement in the provision of material support to LET.  The indictment of at least two such individuals occurred after Defendant's grand jury testimony.[2] While Defendant himself may not have given any testimony that directly led to these indictments, there is no doubt that Defendant's testimony was capable of influencing the grand jury's findings in the course of the investigation that led to these indictments.

Finally, the Court is not persuaded by Defendant's argument that his testimony was immaterial because the Government disbelieved his previous statements and knew how he would testify before the grand jury.  The Fourth Circuit has rejected this theory before, in the context of a perjury entrapment claim[3]:

> The government did suspect that Petitioner provided false statements to the government agents in a prior interview.  However, this does not mean that the government did not have a valid purpose in eliciting Petitioner's testimony before the grand jury.  It also

---

[2]The grand jury indicted Ali Asad Chandia on September 14, 2005 and Ali Al-Timimi on September 23, 2004, less than a month after Defendant's first grand jury appearance.

[3]Although *Sarihifard* dealt with a perjury entrapment claim, the Fourth Circuit's reasoning is analogous and persuasive here.  While Defendant has expressly stated that he does not seek to establish perjury entrapment in this case, his theory of immateriality is based on the notion that his grand jury testimony served no purpose other than to lay the foundation for a perjury charge.  Such a theory requires proof of similar facts as a perjury entrapment claim.  *See Sarihifard*, 155 F.3d at 308 ("Perjury entrapment occurs when a government agent coaxes a defendant to testify under oath for the sole purpose of eliciting perjury.").

> does not show that the government knew Petitioner would
> testify falsely before the grand jury. . . .  Arguably,
> Petitioner's prior false statements provided the
> government with notice that he might testify falsely
> before the grand jury.  However, this falls far short
> of proving that the government asked him to testify for
> the purpose of eliciting perjury.  When the government
> has a legitimate reason for asking a witness to testify
> before the grand jury and the witness is provided with
> adequate warnings, the mere fact that the government
> knows that the witness possibly may provide false
> testimony does not establish the requisite showing of
> inducement.

*Sarihifard*, 155 F.3d at 308-09.  In this case, the Government had

a legitimate reason for calling Defendant before the grand jury.

The grand jury had the right to explore every avenue in

connection with its investigation.  This included questioning

Defendant to see whether he would discuss his possible

involvement, and the grand jury "had the right to observe the

witness's spontaneous response to such questioning." *United

States v. Vesich*, 724 F.2d 451, 461 (5th Cir. 1984).  As such,

the Court will not hold that Defendant's testimony was immaterial

to a grand jury investigation.

### 3.  Inconsistent Positions and the Due Process Clause

Defendant also claims that the Government is presently

asserting a theory that is fundamentally inconsistent with the

one it set forth in the prior prosecution, in violation of

Defendant's due process rights.  Some courts have held that the

Due Process Clause forbids the Government from using

inconsistent, irreconcilable theories to secure convictions at

separate trials.  *See Smith v. Groose*, 205 F.3d 1045, 1051-52
(8th Cir. 2000); *Thompson v. Calderon*, 120 F.3d 1045, 1057-59
(9th Cir. 1997) (en banc) (plurality opinion), *rev'd on other
grounds*, 523 U.S. 538 (1998).

In its 2004 prosecution of Defendant, the Government
sought to prove that Defendant violated Executive Order Number
13129 by participating in a jihad training camp in Afghanistan.
In the instant case, the Government seeks to prove that Defendant
perjured himself when he testified, among other things, that he
did not participate in a jihad training camp during his trip to
South Asia during the summer of 1999.  To prove that this
specific testimony is false, the Government will have to
establish that Defendant did, in fact, participate in a jihad
training camp during the relevant time period.  The location of
the alleged combat training, be it Afghanistan or Pakistan, is
simply not the relevant issue in the Government's theory of this
case.  In light of this, the theory currently forwarded by the
Government is entirely consistent with its theory in the 2004
prosecution.  Defendant's due process claim is meritless.

### 4.  Vindictive Prosecution

Defendant argues that the Government's actions in
calling him to testify before the grand jury and prosecuting him
for perjury are presumptively vindictive.  He relies on the
bedrock principle that the Government may not retaliate against a

criminal defendant for the exercise of his constitutional rights by seeking a harsher punishment at a subsequent proceeding. Defendant claims that the Government is charging him with the same conduct that formed the basis for an earlier false statements charge, that the charge in the instant case carries a more severe punishment, and that the Government is seeking this charge for retaliatory reasons.

In the 2004 case, Defendant was charged with making false statements to a federal law enforcement officer, in violation of 18 U.S.C. § 1001(a)(2).  The relevant portion of that indictment stated as follows:

> BENKHALA [sic] falsely stated to law enforcement agents that he had never been to Afghanistan, that he had never engaged in any type of military-style training other than ROTC and paint-ball, and that his trip to Pakistan in 1999 had been made on the spur of the moment.

(Def.'s Mot. to Dismiss Ex. 1, Count XVI.)  Defendant made the statements charged in Count XVI as he was being flown to the United States after being held captive in Saudi Arabia. Defendant successfully moved to suppress the statements and dismiss Count XVI, and trial went forward on the other counts of the first indictment.  The Government did not appeal Judge Brinkema's suppression and dismissal ruling.

The false statements charge carried a statutory maximum penalty of five years imprisonment.  *See* 18 U.S.C. § 1001(a).  In the instant case, Counts I and II each carry a maximum sentence

of five years, *see* 18 U.S.C. § 1623(a), and Count III carries a maximum sentence of ten years, *see* 18 U.S.C. § 1503(b)(3).  Given that Defendant's previous exposure for the false statements charge was five years imprisonment and his current total exposure is twenty years imprisonment, Defendant argues that the Government is penalizing him for seeking suppression of the statements he made en route to the United States and for successfully defending against the other counts that were charged in the 2004 case.

The Fourth Circuit has articulated two ways in which a criminal defendant may establish prosecutorial vindictiveness. First, the defendant may present objective evidence showing that "(1) the prosecutor acted with genuine animus toward the defendant and (2) the defendant would not have been prosecuted but for that animus."  *United States v. Wilson*, 262 F.3d 305, 314 (4th Cir. 2001).  Absent direct evidence of an improper motive, the defendant must present "evidence of circumstances from which an improper vindictive motive may be presumed.  To invoke such a presumption, a defendant must show that the circumstances 'pose a realistic likelihood of vindictiveness.'" *Id.* (quoting *Blackledge v. Perry*, 417 U.S. 21, 27 (1974)).

In *Blackledge*, the Supreme Court held that a prosecutor could not respond to a criminal defendant's appeal of his conviction by bringing a more serious charge prior to the

defendant's second trial.  417 U.S. at 28-29.  Habeas corpus relief was appropriate even where there was no evidence of actual bad faith on the part of the prosecutor, because the Due Process Clause required that the criminal defendant be free of even the apprehension of a retaliatory motivation on the state's part. *See id.* at 28.  Discussing *Blackledge* and other cases, the Fourth Circuit has stated that "[i]t is thus a violation of due process to penalize a criminal defendant for exercising his constitutional rights."  *United States v. Williams*, 47 F.3d 658, 660 (4th Cir. 1995).

Because Defendant has no direct evidence of prosecutorial animus, he argues that the circumstances of his case require a presumption of vindictiveness.  The Court disagrees.  The presumption of vindictiveness generally applies only where the original charge and the subsequent, more punitive charge cover the same conduct.  *See Blackledge*, 417 U.S. at 23 ("The [felony] indictment covered the same conduct for which Perry had been tried and convicted in the District Court".).  Here, however, that is clearly not the case.  The 2004 charge against Defendant for making false statements to a federal law enforcement officer arose from three statements he made denying that he had been to Afghanistan, claiming that his only military-style training occurred during ROTC and paint-ball, and stating that his 1999 trip to Pakistan had been on a whim.  After these

statements were suppressed, the false statements charge was
dismissed, and Defendant was acquitted on the other charges, the
Government subpoenaed him to appear before the grand jury on two
occasions.  Defendant's testimony on those subsequent occasions
forms the basis for the instant prosecution, not the statements
Defendant made en route to the United States from Saudi Arabia.

Furthermore, the subject matter of most of Defendant's
grand jury testimony is distinguishable from the subject matter
of Defendant's earlier, suppressed statements.  As shown in the
collateral estoppel discussion above, the vast majority of
Defendant's grand jury testimony consisted of denials that he had
participated in a jihad training camp in the summer of 1999, not
denials that he had been to Afghanistan.  It is true that in his
second grand jury appearance, Defendant testified that he had
traveled to Pakistan on the spur of the moment, and that in both
grand jury appearances, Defendant disclaimed that he had
participated in jihad training.  Nevertheless, the Government's
questions before the grand jury probed details of Defendant's
trip to Pakistan and his alleged jihad training in many aspects
not covered by the suppressed statements Defendant made while in
custody.  In this manner, the grand jury testimony elicited by
the Government was not a mere retread of the conduct that formed
the basis for the earlier false statements charge.

Given that the illegal conduct charged in the present indictment is different from that charged in the previous case, it is clear that the Government has not re-indicted Defendant in retaliation for his choice to exercise his constitutional rights. *See United States v. Goodwin*, 457 U.S. 368, 383 (1982) ("Perhaps most importantly, the institutional bias against the retrial of a decided question that supported the decisions in *Pearce* and *Blackledge* simply has no counterpart in this case."). Defendant is not entitled to a presumption of vindictive prosecution.

B.  The Foreign Intelligence Surveillance Act

Defendant next seeks to suppress all evidence derived from any searches and surveillance conducted pursuant to the Foreign Intelligence Surveillance Act ("FISA").  Pursuant to 50 U.S.C. §§ 1806(e), 1825(f), Defendant argues that FISA is unconstitutional, that all information gathered pursuant to FISA was illegally obtained, and that all such evidence should be suppressed.  Defendant claims that FISA violates a litany of constitutional provisions.  Each claim is completely without reasoning or authority, and each claim runs contrary to well-established case law.  As such, the Court will only briefly address each.

First, Defendant argues that FISA violates the Fourth Amendment's requirements of a neutral and detached magistrate, a warrant supported by probable cause, particularity and

-24-

minimization, timely information, and notice.  The Fourth Circuit has squarely rejected the claim that electronic surveillance under FISA violates the Fourth Amendment.  *See United States v. Pelton*, 835 F.2d 1067, 1074-75 (4th Cir. 1987).  Furthermore, this Court has ruled that physical searches conducted pursuant to FISA are consistent with the Fourth Amendment.  *See United States v. Nicholson*, 955 F. Supp. 588, 591 (E.D. Va. 1997).  Defendant does not cite any law to the contrary or provide any reason to depart from these cases.

Second, Defendant claims that this Court's *in camera*, *ex parte* review of FISA materials would violate his Fifth Amendment right to due process and his Sixth Amendment right to counsel.  Again, this Court has previously addressed an identical challenge to FISA and rejected it.  *See Nicholson*, 955 F. Supp. at 592.

Third, Defendant contends that FISA fails "to provide adequate guidance to the government, the judiciary and the general public as to the meaning of its terms," (Def.'s Mot. to Suppress at 2), and that consequently, FISA violates the Due Process Clause and the First Amendment.  Because Defendant does not specify which sections or terms within FISA he finds ambiguous, the Court will interpret his due process challenge to be one challenging the statute on its face for vagueness and overbreadth.  As before, this argument is foreclosed by the

substantial case law to the contrary.  *See, e.g.*, *United States v. Duggan*, 743 F.2d 59, 71 (2d Cir. 1984) (holding that the FISA sections applicable to the defendant were "explicit, unequivocal, and clearly defined"); *Nicholson*, 955 F. Supp. at 592 (rejecting a claim that the FISA terms "agent of a foreign power" and "foreign intelligence information" were unconstitutionally vague); *United States v. Falvey*, 540 F. Supp. 1306, 1315 (E.D.N.Y. 1982) (finding that the FISA terms "agent of a foreign power" and "international terrorism" were not facially overbroad and unconstitutional).

Similarly, Defendant's argument that FISA violates the First Amendment is meritless.  FISA itself explicitly provides that "no United States person may be considered a foreign power or an agent of a foreign power solely upon the basis of activities protected by the first amendment to the Constitution of the United States."  50 U.S.C. § 1805(a)(3)(A).  The Courts that have considered the issue have unanimously rejected claims identical to Defendant's.  *See, e.g.*, *ACLU Found. of S. Cal. v. Barr*, 952 F.2d 457, 465 (D.C. Cir. 1991); *Nicholson*, 955 F. Supp. at 593 n.13; *Falvey*, 540 F. Supp. at 1314.

Fourth, Defendant argues that FISA violates the Equal Protection Clause by creating an unreasonable distinction between national security threats associated with domestic organizations and those related to foreign organizations or powers.  In

*Nicholson*, this Court held that FISA did not violate any fundamental, constitutionally protected rights of surveillance subjects and thus reviewed FISA for a rational basis.  955 F. Supp. at 592.  The Court concluded that "disparate treatment of foreign and domestic groups is rationally related to the 'Act's purposes of attempting to protect the United States against various types of acts of foreign powers and to acquire information necessary to the national defense or the conduct of foreign affairs.'"  *Id.* (quoting *Duggan*, 743 F.2d at 76).

        Finally, Defendant argues that the Foreign Intelligence Surveillance Court exists in a state of violation of Article III of the Constitution, the political question doctrine, and the separation of powers doctrine.  Every court, including this one, that has addressed similar arguments has completely rejected them.  *See, e.g.*, *Nicholson*, 955 F. Supp. 592.  Once again, Defendant has cited no law to the contrary or provided a reason to depart from "this unbroken line of established case law."  Id. For the above reasons, the Court will deny Defendant's motion to suppress all evidence derived from any searches and surveillance conducted pursuant to FISA.

C.  Motion to Exclude Testimony, and for a *Kastigar* Hearing

        On April 7, 2004, Judge Hilton ordered Defendant to testify completely and truthfully before the grand jury.  The Order also required Defendant to provide truthful information in

-27-

regard to any proceedings ancillary to the grand jury proceeding,
with the understanding that such information could not be used
against him in any criminal case except for, *inter alia*, a
prosecution for perjury or making false statements.  Shortly
after the entry of this Order, the Government sent Defendant a
letter offering him the opportunity to discuss his grand jury
testimony with the Government outside of the grand jury and with
his lawyer present, in hopes of shortening Defendant's actual
grand jury testimony.  The letter offered immunity for the
information relayed in these meetings with the same exceptions
for, among other things, false statements.  The letter also
explicitly referred to Judge Hilton's Order of April 7, 2004 and
stated that the meetings would be considered proceedings
ancillary to the grand jury proceeding.  Defendant accepted the
terms of this letter by signing it.  Defendant now seeks to
exclude any statements he made to the Government in the
debriefings that occurred prior to or after any of his grand jury
appearances.

In *United States v. Apfelbaum*, 445 U.S. 115 (1980), the
Supreme Court held that the entirety of a defendant's statements
were admissible in a prosecution for perjury based on immunized
testimony.  *Id.* at 123.  Defendant argues that *Apfelbaum* is
distinguishable, claiming that the debriefings are not
intermingled with the claimed grand jury perjury and that they

touched on many other matters.  Therefore, Defendant asks that the statements from the debriefings not be admitted.

This Court cannot ignore the plain language of the April 19, 2004 letter or the precedent of *Apfelbaum*.  The letter explicitly stated that the debriefings would be treated as "a proceeding or proceedings ancillary to your appearance before the grand jury so that the protections of Judge Hilton's Order will apply to your statements made at such meeting or meetings." (Def.'s Motion to Dismiss Ex. 4.)  Importantly, Defendant makes no attempt to explain why this letter should not be given full effect.  Judge Hilton's Order may have been sufficient to reach this same conclusion, but the additional clarity of the letter allows no other interpretation than to admit the statements under the perjury exception to the grant of immunity.

Similarly, *Apfelbaum* helps to bolster this Court's resolution of this clear-cut issue.  In *Apfelbaum*, the Supreme Court addressed statements made within the grand jury, rather than debriefings outside the grand jury.  Yet, the logic remains the same when applied to the instant case.  The Supreme Court determined that "Congress intended the perjury and false-declarations exception to be interpreted as broadly as constitutionally permissible." *Apfelbaum*, 445 U.S. at 122.  The Court therefore concluded "that Congress intended to permit the use of both truthful and false statements made during the course

of immunized testimony if such use was not prohibited by the Fifth Amendment." *Id.* at 123.  Nothing in the decision suggests that a limitation in the present situation is necessary, especially given the additional understanding as spelled out in the April 19, 2004 letter.  Furthermore, the Defendant conceded in his papers and in open court that *Apfelbaum* is binding precedent.  Thus, the Court will deny Defendant's motion to exclude testimony.  As such, there is no need for a *Kastigar* hearing.

## D.  Motion to Suppress

Defendant seeks to suppress all evidence seized as a result of a search of his computer.  The Saudi police seized the computer, along with other material, at the time of Defendant's arrest.  All the materials except the computer were initially delivered to the United States.  The United States requested the computer as well as all information found on it in a letter dated August 23, 2003 and addressed to the Saudi Minister of Interior. This is the evidence Defendant seeks to suppress.

The Government argues that even if the Court were to assume that its examination of the computer hard drive was improper, the evidence should still be admitted on two grounds: 1) because Defendant testified about it in the course of the grand jury testimony from which the perjury charges stem; and 2) because Defendant is charged with perjury that post-dated the

unlawful search, and Defendant was aware of the evidence obtained in the search at the time of the alleged perjury.  In support of the second argument, the Government cites cases from the Fifth and Ninth Circuits, both of which hold that illegally obtained evidence can be admitted at perjury trials when the perjury occurred after the search and with the knowledge that the search had taken place.  *See United States v. Raftery*, 534 F.2d 854, 857 (9th Cir. 1976); *United States v. Turk*, 526 F.2d 654, 667 (5th Cir. 1976).  These courts reasoned that the deterrent benefits of the exclusionary rule do not outweigh the cost of excluding the evidence.  *See Raftery*, 534 F.2d at 857; *Turk*, 526 F.2d at 667.

The Government also cites *United States v. Varela*, 968 F.2d 259 (2nd Cir. 1992), for the same proposition.  In *Varela*, the Second Circuit concluded that employing the exclusionary rule in this type of situation would not lead to significant additional deterrence of improper police conduct.  *See id.* at 262.  The court reasoned that the imputation of additional deterrent value would require a finding that the police were motivated by the unlikely possibility of the defendant committing perjury before a grand jury after his statements had been suppressed and he had been granted immunity.  *See id.*  The Second Circuit revisited this position in *United States v. Awadallah*, 349 F.3d 42 (2nd Cir. 2003), and again focused on the deterrent value of utilizing the exclusionary rule.  The court determined

-31-

in *Awadallah* that the exclusionary rule should not be applied to the facts of that case and allowed the admittance of the evidence.  *Id.* at 96-97.

The Court acknowledges, as Defendant points out, that the Fourth Circuit has never adopted this specific logic. However, the Court disagrees with Defendant that this is an extreme interpretation of the law.  The evidence should certainly be admitted to the extent that Defendant testified about it before the grand jury.  Indeed, to hold otherwise would be to condone perjury regarding evidence that was seized illegally in the past.  Furthermore, this Court adopts the logic of *Raftery*, *Turk*, and *Varela*.  The balance of the benefits of deterrence compared to the costs of condoning perjury weighs in favor of admitting the evidence.  Thus, assuming without finding that the search and seizure of this evidence was illegal, it can still be admitted in this perjury trial because Defendant testified about it in front of the grand jury, and he was aware of the evidence obtained in the search at the time of the alleged perjury. Defendant's motion to suppress will be denied.

### III.  Conclusion

For the foregoing reasons, the Court will deny each of Defendant's motions to dismiss, deny Defendant's motion to suppress all evidence derived from searches or seizures conducted pursuant to FISA, deny Defendant's motion to exclude testimony

and for a *Kastigar* hearing, and deny Defendant's motion to suppress evidence seized as a result of Defendant's arrest.  An appropriate Order will issue.


May 17, 2006                    _____/s/_____
Alexandria, Virginia                    James C. Cacheris
                           UNITED STATES DISTRICT COURT JUDGE