IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

UNITED STATES OF AMERICA,       )
                                )
          v.                    )
                                )       1:06cr9(JCC)
SABRI BENKAHLA,                 )
                                )
          Defendant.            )

# **M E M O R A N D U M   O P I N I O N**

Defendant, Sabri Benkahla, stands before this Court charged with two counts of making false declarations before a grand jury, in violation of 18 U.S.C. § 1623; one count of obstruction of justice, in violation of 18 U.S.C. § 1503; and one count of false statements and concealment, in violation of 18 U.S.C. § 1001.  Defendant has filed a motion to dismiss and a motion in limine, and Government has filed a motion to exclude reference to Defendant's prior acquittal.  All of these motions are currently before the Court.  For the reasons stated below, the Court will deny Defendant's motion to dismiss, grant in part and deny in part Defendant's motion in limine, and grant the Government's motion to exclude.

## **I.  Background**

On August 26, 2004, Defendant testified before a federal grand jury regarding his possible participation in a jihad training camp and use of automatic weapons and rocket

propelled grenades ("RPGs").[1]  Defendant's testimony centered around a trip that he took to Pakistan and possibly Afghanistan during the summer of 1999, as well as e-mail correspondence referring to the trip.  Defendant testified that during his 1999 trip he did not participate in any training relevant to combat, witness any training relevant to violent jihad, witness any training relevant to combat, handle a firearm or an explosive device, discharge a firearm or an explosive device, or witness anyone else discharge a firearm or an explosive device.  During the same grand jury appearance, Defendant also testified that he had not ever fired an AK-47 or an RPG.  The Government questioned Defendant about two e-mails he had sent referring to "studying in Afghan" and traveling to a "place far, far away," which was "top secret info."  Defendant testified that these e-mails did not refer to jihad training in Afghanistan.  The Government also questioned Defendant about a third e-mail in which Defendant referred to an individual named Haroon.  Defendant testified that he could not identify Haroon or the recipient of the e-mail.

On November 16, 2004, Defendant testified before the grand jury for a second time.  During this appearance, Defendant testified that he saw no one other than Pakistani Army soldiers carrying firearms during his trip in the summer of 1999, that he

---

[1]Pursuant to 18 U.S.C. § 6003, Judge Hilton entered an Order on April 7, 2004 compelling Defendant's testimony in the grand jury investigation and granting him use immunity.

had never fired an AK-47, that he had never fired an automatic
weapon of any kind, and that he had never fired an RPG.  Because
Defendant first traveled from the United States to Great Britain
and then purchased a ticket to Pakistan, the Government
questioned Defendant about his reasons for doing so.  Defendant
testified that he was not sure whether he would go to Pakistan
until he arrived in London and that he decided to make the trip
after meeting, for the first time, an individual in Great Britain
who agreed to show him around Pakistan.

On April 22, 2004 and July 7, 2004, Defendant made
statements to an agent of the Federal Bureau of Investigation
("FBI") conducting an investigation into jihad training camps
under the control of terrorists espousing violence against the
United States.  During this interview, Defendant stated to the
FBI agent that he did not know certain details about specific
persons and his interactions with those persons (*i.e.,* the
person's last name, whether he had spoken with the person,
whether he had met the person, whether jihad had been discussed).
Defendant also told the FBI agent that he had never fired an AK-
47 or an RPG nor had he ever participated in jihad training.

Defendant's August 26, 2004 grand jury testimony forms
the basis for Count I of the indictment, and Defendant's November
16, 2004 grand jury testimony forms the basis for Count II.
Count III, the obstruction of justice charge, is based on both of

-3-

these occasions.  Defendant's statements to the FBI agent on April 22, 2004 and July 7, 2004 form the basis for Count IV.

## II.  Analysis

### A.  Defendant's Motion to Dismiss Count IV (Collateral Estoppel)

Defendant's motion to dismiss seeks to preclude the Government from relitigating issues that he claims were resolved against the Government during his prior prosecution. Specifically, Defendant seeks to preclude any reference to Afghanistan in Count IV since the Court found in his prior prosecution that the Government had not proven, beyond a reasonable doubt, that Defendant had participated in combat training within the Taliban-controlled regions of Afghanistan. On the same grounds as this Court's May 17, 2006 Opinion, the Court will deny Defendant's motion to dismiss based on collateral estoppel. (Mem. Op., May 17, 2006, 7).

In 2003, Defendant was arrested in Saudi Arabia, flown back to the United States, and prosecuted in this district for willfully supplying and attempting to supply services to the Taliban, in violation of 50 U.S.C. § 1705, the penalty provision for violations of the International Emergency Economic Sanctions Act ("IEEPA").  Defendant was also charged with using a firearm in furtherance of the alleged IEEPA violation, in violation of 18 U.S.C. § 924(c).  The charges were based on: (1) Defendant's alleged participation, during his trip to South Asia in the

-4-

summer of 1999, in a jihad training camp operated by the
Pakistani terrorist group Lashkar-e-Taiba ("LET") in the
territory of Afghanistan controlled by the Taliban; and (2)
Defendant's alleged use of firearms in the course of this
participation.

At the time of Defendant's trip to South Asia, LET had
not yet been officially designated a terrorist organization, and
provision of services to LET had not yet been banned.  Pursuant
to President Clinton's Executive Order of July 4, 1999, however,
the provision of services to the Taliban or to the territory of
Afghanistan controlled by the Taliban constituted a violation of
IEEPA.  *See* Exec. Order No. 13129.  *See also* 31 C.F.R. § 545.204.
Accordingly, proof that Defendant participated in a LET jihad
training camp was insufficient by itself to convict Defendant of
either charge.  In the absence of evidence that Defendant
provided services directly to the Taliban, the Government was
required to establish that Defendant's combat training occurred
within the territory of Afghanistan controlled by the Taliban.

In March 2004, Defendant waived a jury trial and was
tried on the above charges by Judge Leonie M. Brinkema.  After
trial, Judge Brinkema found that the Government had not proven,
beyond a reasonable doubt, that Defendant had participated in
combat training within the Taliban-controlled regions of
Afghanistan.

-5-

Defendant seeks to bar the use of any reference to Afghanistan with respect to the statements made in Count IV by collateral estoppel. In *Ashe v. Swenson*, 397 U.S. 436 (1970), the Supreme Court held that the doctrine of collateral estoppel is embodied within the Fifth Amendment guarantee against double jeopardy. *Id.* at 445-46. Thus, "when an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated between the same parties in any future lawsuit." *Id.* at 443. An issue is precluded only where: (1) the issue in question is identical to the previous issue; (2) the issue was actually determined in the prior adjudication; (3) the issue was necessarily decided in the earlier proceeding; (4) the resulting judgment settling the issue was final and valid; and (5) the parties had a full and fair opportunity to litigate the issue in the prior proceeding. *United States v. Fiel*, 35 F.3d 997, 1006 (4th Cir. 1994). Each of these five elements must be resolved in the movant's favor before an issue will be precluded. *See United States v. Ruhbayan*, 325 F.3d 197, 202 (4th Cir. 2003). Furthermore, "[r]easonable doubt as to what was decided by a prior judgment should be resolved against using it as an estoppel." *Id.* at 203 (internal citation omitted; alteration in original).

In this case, the Court needs not go any further than the first element to address Defendant's claim. In order to

prove the falsity or concealment of some of Defendant's
statements to the FBI Agent, the Government will have to
establish that Defendant attended a jihad training camp or fired
an automatic weapon or RPG.  Nevertheless, this case does not
involve issues that are identical to the previous prosecution.

As this Court ruled in response to Defendant's previous
motion to dismiss based on collateral estoppel, the previous
prosecution required the Government to prove that Defendant's
combat training activities occurred within the Taliban-controlled
regions of Afghanistan. (Mem. Op., May 17, 2006, 7).  It was this
element of the prosecution that Judge Brinkema found deficient.
In the present case, "the location of Defendant's combat training
is largely irrelevant." *Id.*  In the count at issue (Count IV),
Government alleges that Defendant made false statements to the
FBI Agent that he never received or participated in jihad
training *anywhere* in the world.  Instead, Government alleges that
he did actually engage in such training during his trip to South
Asia in the summer of 1999, and further, that he fired a firearm
or an explosive device during this time period.

To prove the falsity of these statements, the
Government logically must establish that Defendant attended a
combat training camp or fired a firearm or explosive device
during the relevant time period.  The question of "where" was
only relevant to the previous prosecution; in the instant case,

-7-

the issue of utmost relevance is whether Defendant did engage in the activities at issue, and if so when. In other words, the issues are not identical.

Furthermore, if the issues in the previous case are not identical to those in the instant case, those issues could not have been actually determined.  In the previous prosecution, Judge Brinkema found only that the Government failed to prove that Defendant attended a jihad training camp in Afghanistan. She did not find, as a general matter, that the Government failed to prove that Defendant attended a jihad training camp.  The Government is therefore entitled to prove that Defendant participated in a combat training camp, witnessed training relevant to combat and violent jihad, fired weapons, and engaged in other related conduct during his 1999 trip, whether in Pakistan or Afghanistan.[2]

The central issue in this prosecution is whether Defendant participated in a combat training camp, regardless of the location, whether Afghanistan or Pakistan.  Since this Court has never "actually decided" this "identical" issue, collateral

---

[2]Furthermore, this Court provided clear guidance to the parties by listing the portions of Defendant's grand jury testimony that are susceptible to proof of falsity in this action. *Id*. at 8-12.  In that list, the Court provided several statements that Defendant did not participate in training relevant to combat and violent jihad in "Pakistan or Afghanistan." *Id.*  The Court adopts that same position as to Defendant's statements to the FBI agent and holds that such similar statements are susceptible to proof of falsity.

estoppel is inappropriate.  As such, Defendant's motion to dismiss Count IV will be denied.

### B. Defendant's Motion in Limine to Bar 404(B) Evidence

Defendant moves to exclude numerous Government exhibits as character evidence under Federal Rule of Evidence 404(b). First, Defendant challenges the admission of evidence that Defendant has failed to pay his taxes since 1999.  Second, Defendant challenges the admission of the following exhibits, which were documents identified at Benkahla's previous trial:

| | | | | |
|---|---|---|---|---|
| 3A8 | 7A35 | 7A35a | 7A35b | 7A35c |
| 7A35ci | 7A35d | 7A35e | 7A35f | 7A35g |
| 7A35h | 7A35i | 7A35j | 7A35k | 7A35l |
| 7A35m | 9G1 | 9G2 | 9G5 | 9G6 |
| 9G7 | 9G8 | 9G9 | 9G10 | 9G11 |
| 9G12 | 9G13 | 9G14 | 9G15 | 9G16 |
| 9G18 | | | | |

The Court will address the admissibility of the evidence demonstrating Defendant's failure to pay taxes, and then will address the above enumerated exhibits.

### 1.  Defendant's Failure to Pay Taxes Since 1999.

The admissibility of evidence showing Defendant's failure to pay taxes is governed by Rule 404(b), which provides:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith.  It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake of accident . . .

F.R.E. 404(b).  To support the admission of this evidence, the
Government states that it will demonstrate that individuals of
the ideology of hatred shared by Benkahla and his colleagues
avoid paying taxes to the United States because, in paying taxes,
they would support the world's greatest enemy of Islam.
Witnesses will testify that Benkahla's jihad training group was
counseled by "Timimi" that they should leave the country before
they pay taxes to the United States.  Further, the Government
will provide an expert to testify about the importance of evading
taxes to the United States in the mindset of those who support
Taliban and related groups against the United States.

The Government argues that, after it provides this
testimony, Benkahla's refusal to pay taxes is probative of his
intent.  Particularly, the refusal to pay taxes is probative of
Benkahla's belief that the United States is the world's greatest
enemy of his faith, and therefore, is probative of his state-of-
mind and his intent to participate in a jihad training camp.

Rule 404(b) excludes evidence of prior crimes when
offered to prove the character of a person in order to show
action in conformity with that character.  F.R.E. 404(b).  In
other words, Rule 404(b) seeks to prevent convictions simply for
possessing bad character.  However, in *United States v. Queen*,
the Fourth Circuit stated this concern diminishes where identity
is not an issue.  132 F.3d 991, 997-98 (4th Cir. 1997).

-10-

Furthermore, the Fourth Circuit found that "where the trial judge has given a limiting instruction on the use of Rule 404(b), the fear that the jury may improperly use the evidence subsides." *Id.*

In this case, Benkahla's identity is clearly not at issue, thus concerns of using the evidence for general "bad character" diminishes significantly.  Therefore, so long as the Government establishes adequate foundation that the evidence is being used to establish intent, evidence of Benkahla's failure to pay taxes is relevant and admissible.  To minimize improper use of this evidence by the jury, a limiting instruction will be given.

> 2.  The video "Russian Hell" (3A8), the email and
>      accompanying website content (7A35 series), and
>      the 9G series emails.

First, the Court feels it is necessary to clarify an important issue with respect to the attempted exclusion of these exhibits.  As stated above, Rule 404(b) governs the admissibility of evidence of other crimes, wrongs, or acts.  The exhibits at issue are e-mails, documents, websites, and a video sent and received by Defendant or his colleagues.  These exhibits are not evidence of Defendant's prior bad acts, wrongs, or crimes; nor is this evidence offered to establish Defendant's general character.  Therefore, Rule 404(b) is not the correct vehicle to attempt to exclude this evidence.  Instead, the question before this Court is whether this evidence is relevant under Rule 401.  If

relevant, then this Court must decide whether the evidence should be excluded as prejudicial under Rule 403.  This approach is also appropriate upon viewing Defendant's motion in limine, which although titled as a 404(b) motion, focuses on excluding the evidence not because it is character evidence, but because it is irrelevant.

Defendant argues that since none of these exhibits were authored by defendant, sought out by defendant, nor received by defendant before his alleged trip to a jihad camp, they are irrelevant as to Defendant's intent and thus should be excluded. To simplify matters, the Court will discuss these pieces of evidence in the following groups: (1) the videotape 3A8, (2) the e-mail 7A35 and the accompanying websites; and (3) the 9G series.

<u>The video "Russian Hell" 3A8</u>:

Government exhibit 3A8 is a video documentary entitled "Russian Hell 2000" and was originally admitted at Benkahla's previous trial.  The video was seized from Hamdi, a friend of Defendant, and depicts the mujahideen[3] engaged in violent jihad in Chechnya.  The video is allegedly well-known throughout Benkahla's training group and discussed thoroughly among them as alleged in exhibit 7A35.  The Government argues: (1) the video is admissible to show the context of the investigation and the materiality of Defendant's answers; (2) the video corroborates

---

[3] "Mujahideen" is an Arabic term for those who engage in jihad.

-12-

the close relationship between Benkahla and the Government
witnesses that will testify against him; (3) the video is
probative of Defendant's intent since the evidence will show that
Defendant and his colleagues obtain inspiration from this video;
(4) the video provides context to understand other e-mails.

Federal Rule of Evidence 403 provides that relevant
evidence "may be excluded if its probative value is substantially
outweighed by the danger of unfair prejudice." F.R.E. 403. In
the following discussion, the Court will address the video's
relevance, probative value,[4] and potential to mislead, confuse,
or prejudice. In weighing these, the Court will examine whether
the evidence should be excluded under Rule 403.

First, with respect to relevance, a video depicting
disturbing acts of violent jihad, when seized from a computer
belonging to a friend of Defendant and addressed in an email
possessed by Defendant, makes it more probable, even if only in
the slightest, that Defendant had the intent to participate in a
combat training camp. Whether Defendant had such intent is
clearly a "fact of consequence" in this prosecution, and
therefore, the evidence is "relevant" within the meaning of Rule
401.

---

[4] Whether evidence is relevant under Rule 401 is a binary inquiry:
evidence is relevant or irrelevant. The inquiry into probative value,
however, is a question of degree: how much more probable (or less probable) is
the existence of a fact of consequence from the evidence.

However, the video's probative value is considerably weak for several of reasons.  First, the video's probative value is significantly diminished because it was not seized from Defendant's computer, but from the computer of a friend.  Second, the Government offers no proof that Defendant ever praised or showed approval of the video.  In fact, the Government offers no evidence that Defendant ever possessed or even viewed the video.  Third, the e-mail discussion of the video among Benkahla's colleagues is not substantive.  At best, the e-mails briefly reference the video or jihad in Chechnya.  A heavy discussion focused on the video and praising the acts portrayed within would provide significantly more probative value for this evidence's admission.  However, this is not the case.  Instead, one email forwarded to Defendant speaks briefly of the video and the other e-mails' fail to mention the video's content at all.

Regarding the video's potential for prejudice, this Court finds without hesitation that the video "Russian Hell" is unequivocally prejudicial.  The Court viewed the six minute "clip" the Government wishes to introduce.  Within this clip, the mujahideen destroys a Russian convoy by explosion, and then films the subsequent conflagration containing burning bodies.  However, the majority of the clip focuses on the mujahideen's interaction with Russian soldiers taken prisoner.  Most disturbing of these interactions are two execution scenes.  First, the video contains

-14-

a scene of an individual approaching a wounded Russian soldier, placing his rifle at the back of the soldier's head at point-blank range, and discharging his weapon into his victim's head. Presumably dead, the Russian soldier remains immobile with a bloody wound in his head before the camera cuts away. Also contained in the video is footage of another Russian prisoner, unable to walk due to disorientation, being executed by an individual repeatedly firing into his head while his body convulses violently. To be sure, these scenes depicting the mujahideen's mistreatment of the Russian soldiers would prejudice the jury against Benkahla if admitted into evidence.[5]

In weighing the probative value against the danger of unfair prejudice, this Court finds that "Russian Hell" is a quintessential example of evidence that should be excluded under Rule 403. This Court refuses to allow a jury to see a video depicting executions and prisoner mistreatment when the Government has provided no evidence that Defendant praised the video, approved of the video, possessed the video, or ever even watched the video. In sum, the video's probative value is considerably weak and, if viewed by a jury, the grisly scenes undoubtedly would result in unfair prejudice against Defendant.

---

[5] The Court wants to clarify that during oral argument on this motion in limine, the Court was under the impression that the video contained an execution by beheading. Upon watching the video, the Court realized the executions were by firearm instead, although equally barbaric.

This danger of prejudice clearly and substantially outweighs the video's slight probative value, and therefore, under Federal Rule of Evidence 403, the video "Russian Hell" (GX 3A8) will be excluded.[6]

## E-mails Labeled 7A35, 7A35a,b,ci,d,e,f,g,h,i,j,k,l,m

Government Exhibit 7A35 is a November 2000 e-mail from Kwon, a friend of Defendant (and Government Witness) to Defendant Benkahla.  The e-mail 7A35 contains a recommendation that Benkahla visit several websites by the name of www.jihadpath.com, www.jihadroad.com, go2jihad.cjb.net, and connect.to/jihad.  It further contains a message (that apparently Kwon is forwarding) from an individual discussing his desire to participate in jihad and his approval of the aforementioned video.  Exhibits 7A35a through 7A35m are the content downloaded from these websites mentioned in Exhibit 7A35a.

The Court finds all these exhibits relevant and admissible.  An e-mail (7A35) sent by a friend directly to Defendant containing commentary approving of jihad and websites dedicated to jihad is relevant to Defendant's intent as to his participation in a jihad training camp.  Furthermore, Defendant's possession of website addresses that not only express approval of jihad but facilitate participation in jihad also are clearly

---

[6]The Court may be amenable to referencing the content of the video as necessary to provide the context of the e-mails and the discussion within those e-mails.

relevant to Defendant's desire to participate in one of these training camps.[7]  Therefore, this Court concludes that the e-mail (7A35) and the accompanying exhibits of website content (7A35a through m) are relevant and admissible.

<u>E-mails 9G1 and 9G2</u>

E-mails 9G1 and 9G2 are e-mails sent by Defendant describing his travels, discussing Islam, and soliciting advice. Furthermore, these e-mails were the subject of extensive questioning now central to this prosecution.  Both e-mails are clearly evidence of Defendant's intent and the materiality of his answers.  Defendant incorrectly argues that this Court has ruled that the alleged truth of these two e-mails cannot be re-litigated.  As provided in the Court's discussion denying collateral estoppel, this Court has only ruled that the Government may not use these e-mails in an attempt to prove that Defendant participated in jihad training *in Afghanistan*. However, they are entirely relevant and admissible as to the Government's attempt to prove that Defendant lied about attending jihad or combat training *somewhere* during the summer of 1999.

---

[7] This Court easily reconciles the admission of the website content (7A35a-m) and the exclusion of "Russian Hell"(3A8): First, the website content simply is not comparable to "Russian Hell" with respect to potential for prejudice.  Second, the websites in 7A35a-m actually facilitate participation in jihad, which is central to this prosecution.  "Russian Hell"'s connection to Defendant's intent is far more tenuous.  Third, although the Government cannot show that Defendant visited the websites, these website addresses were taken from an e-mail that Defendant possessed, unlike "Russian Hell" which was seized from a colleague of Defendant.

E-mail 9G5

        Government Exhibit 9G5 is an October 2000 e-mail to
Defendant from Garbieh, who is expected to testify that Defendant
admitted going to a jihad training camp.  The e-mail is an
article that was apparently downloaded from a LET website.  This
e-mail is probative of Defendant's state-of-mind as to his
awareness of the LET and its website.  Furthermore, this e-mail
corroborates Garbieh and Defendant's relationship and that they
communicated about subjects related to Islam, holy war, and LET.
Therefore, this e-mail is relevant and admissible.

E-mails 9G6, 9G7, 9G10, 9G12, 9G18

        These exhibits are all e-mails to Defendant in 2001
from an individual identified as "Affan" that Defendant retained
in his e-mail "inbox" until June or July 2003.  The e-mails
contain approval of the Taliban regime, information about the war
in Chechnya, poems approving of jihad and martyrdom, and messages
about individuals hoping for the opportunity to engage in jihad.
All of these e-mails are relevant and admissible.  In discussing
jihad and martyrdom, these e-mails are probative of Defendant's
intent since they were in his possession for several years and
deleted soon after Abu-Ali was arrested.  Furthermore, these e-

-18-

mails provide significant context for the questioning of Defendant and the materiality of his answers.

E-mails 9G8 and 9G9

Government Exhibits 9G8 and 9G9 are e-mails from Kwon in May 2001 that Defendant retained in his e-mail inbox until shortly after Abu-Ali was arrested in June 2003. Exhibit 9G8 suggest arguments to be used to justify the actions of the Taliban, and 9G9 consists of a speech by Osama Bin Laden. These e-mails corroborate Kwon's expected testimony regarding his close relationship with Defendant and the communications between them. Furthermore, like the other e-mails, these e-mails are relevant to Defendant's state-of-mind; they demonstrate approval of staunch advocates of jihad; namely, the Taliban and Osama Bin Laden. Additionally, Benkahla's deletion of these e-mails after Abu Ali's arrest are probative of his intent to sever any possible connection to Kwon. Consequently, these e-mails are relevant and admissible.

E-mail 9G11

Government Exhibit 9G11 is an e-mail that is apparently a questionnaire from Benkahla to a potential spouse, courting the woman with inquiries such as: "[i]f you were pregnant and your husband wanted to go to jihad, how would you advise him?" This e-mail is clearly probative of Defendant's state-of-mind

-19-

regarding his intent to engage in jihad, and therefore is relevant and admissible.  On the contrary, the answers by the potential spouse are irrelevant and are not admissible.

E-mail 9G13

Government Exhibit 9G13 is a May 2001 e-mail from Benkahla in which he declared his hope to devote his life to "seeking knowledge, calling others to Islam(dawa) and jihad." This clearly is direct evidence of Defendant's state-of-mind and is irrefutably probative of his intent to engage in jihad or jihad training.  Therefore, the e-mail is relevant and admissible.

E-mail 9G16

Government Exhibit 9G16 is an e-mail from Defendant to Kwon, Hamdi, Garbieh, Timimi, Abu Ali, and others.  This e-mail shows that Defendant initiated communications with those that may testify against him, just as they often initiated communications with him.  Therefore, this e-mail is relevant and admissible to help establish and corroborate the relationship between Defendant and the individuals expected to testify at trial.

C. Government's Motion to Exclude Reference to Defendant's Prior Acquittal

The United States moves to exclude all references to Benkahla's prior acquittal at trial in 2004.  The Government argues that the fact Benkahla was acquitted of the charges

against him at the previous trial is irrelevant in this case.
This Court agrees.

As discussed *infra*, in 2004, Judge Brinkema found
Defendant not guilty of having participated in combat training in
Taliban-controlled regions of Afghanistan.  While the Government
will have to prove elements in this prosecution that are similar
to those at issue in the 2004 trial, the prior acquittal is
irrelevant since its introduction would allow the jury to
conclude *only* that the Government did not prove all elements
required for conviction of the prior prosecution.  Not only is
such a conclusion irrelevant to this prosecution, but it also
begs the jury to speculate, as any reasonable juror necessarily
would wonder whether the Government failed to prove all, most,
some, or only one of the elements at the previous trial.
Therefore, since the prior acquittal is irrelevant and its
introduction would only trigger endless speculation by the jury,
this Court will exclude any reference to Defendant's prior
acquittal.[8]

Even if the prior acquittal was relevant, the Court
would still exclude it as confusing and misleading under Rule
403.  In reaching this decision, the Court gave thorough
consideration as to exactly *how* the acquittal would be admitted,

---

[8] Any reference to Defendant's prior trial instead shall be a "prior
hearing."  For example, a reference by the parties to testimony at Defendant's
prior trial will be referenced as a "testimony at a prior hearing."

if deemed relevant.  Both parties wished for the prior acquittal
to be admitted, but only on certain conditions.  The Defendant
argued for the prior acquittal's admission, but only to the
extent that Defendant was found "not guilty."  To the contrary,
the Government argued that, if the acquittal is admitted, the
particular grounds upon which the acquittal was based should be
specified.[9]  The Court believes that both of these options would
only confuse and mislead the jury, and the appropriate resolution
is to exclude the previous acquittal altogether.  Therefore, even
if the prior acquittal is relevant, this Court still finds that
its admission would also be precluded as confusing and misleading
under Rule 403.

In conclusion, the Court will: (1) deny Defendant's
Motion to Dismiss Count IV on the grounds of collateral estoppel;
(2) deny Defendant's motion in limine to exclude evidence of
Defendant's failure to pay taxes; (3) grant Defendant's motion in
limine with respect to the video "Russian Hell" (3A8) and the
"answers" from 9G11; (4) deny Defendant's motion in limine to
exclude 7A35, 7A35a-m, and 9G series exhibits; and (5) grant the
Government's motion to exclude the admission of Defendant's prior
acquittal.

---

[9]In the Government's interpretation of Judge Brinkema's opinion, the
Court found that Benkahla participated in a jihad training camp, but could not
conclude beyond a reasonable doubt that said training camp was in Taliban-
controlled regions of Afghanistan.  Defendants dispute this reading.

### III.  Conclusion

For the foregoing reasons, the Court will deny

Defendant's Motion to Dismiss, grant in part and deny in part

Defendant's Motion in Limine, and grant the Government's Motion

to Exclude.


October 2, 2006                    _____/s/_____
Alexandria, Virginia                       James C. Cacheris
                              UNITED STATES DISTRICT COURT JUDGE