IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

UNITED STATES OF AMERICA,      )
                               )
          v.                   )
                               )      1:06cr9(JCC)
SABRI BENKAHLA,                )
                               )
          Defendant.           )

# M E M O R A N D U M   O P I N I O N

The matter before the Court is the determination of Defendant Sabri Benkahla's sentence.  The central issue to be decided is whether Defendant should receive a sentencing enhancement pursuant to United States Sentencing Guideline § 3A1.4, more commonly referred to as the "terrorism enhancement."

## Introduction

On August 26, 2004, Defendant testified before a federal grand jury regarding his participation in a jihad training camp and his use of automatic weapons and rocket propelled grenades ("RPGs").[1]  Defendant's testimony centered around a trip to Pakistan and possibly Afghanistan during the summer of 1999, as well as e-mail correspondence referring to the trip.  Defendant testified that during his 1999 trip he did not participate in any training relevant to combat, witness any training relevant to violent jihad or combat, handle or discharge

_____

[1]Pursuant to 18 U.S.C. § 6003, Judge Hilton entered an Order on April 7, 2004 compelling Defendant's testimony in the grand jury investigation and granting him use immunity.

-1-

a firearm or an explosive device, or witness anyone else discharge a firearm or an explosive device.  During the same grand jury appearance, Defendant also testified that he had never fired an AK-47 or an RPG.  The Government questioned Defendant about two e-mails he had sent referring to "studying in Afghan" and traveling to a "place far, far away," which was "top secret info."  Defendant testified that these e-mails did not refer to jihad training in Afghanistan.  The Government also questioned Defendant about a third e-mail in which Defendant referred to an individual named Haroon.  Defendant testified that he could not identify Haroon or the recipient of the e-mail.

On November 16, 2004, Defendant testified before the grand jury for a second time.  During this appearance, Defendant testified that he saw no one other than Pakistani Army soldiers carrying firearms during his trip in the summer of 1999, and that he had never fired an AK-47, an RPG, or an automatic weapon of any kind.  Because Defendant first traveled from the United States to Great Britain and then purchased a ticket to Pakistan, the Government questioned Defendant about his reasons for doing so.  Defendant testified that he was not sure whether he would go to Pakistan until he arrived in London and that he decided to make the trip after meeting, for the first time, an individual in Great Britain who agreed to show him around Pakistan.

On April 22, 2004 and July 7, 2004, Defendant made statements to an agent of the Federal Bureau of Investigation ("FBI") conducting an investigation into jihad training camps under the control of terrorists espousing violence against the United States.  During this interview, Defendant stated to the FBI agent that he did not know certain details about specific individuals with whom he had interacted (*i.e.,* the last name, whether he had ever met or spoken with that individual, and if so, whether jihad had been discussed).  Defendant also told the FBI agent that he had never participated in jihad training or fired an AK-47 or RPG.

On February 5, 2007, a jury convicted Defendant on all counts: false declarations to the grand jury on August 26 and November 16, 2004, (respectively, Counts I and II); obstruction of justice (Count III); and false statements to an FBI Agent (Count IV).  After this conviction, Defendant moved for a judgment of acquittal and a new trial.  The Court granted Defendant's motion for judgment of acquittal as to Count II, but denied the motion as to all other grounds.  Defendant now comes before the Court for sentencing.

## **Whether USSG § 3A1.4 Should Apply**

The issue before the Court is whether Defendant should receive a sentencing enhancement pursuant to United States Sentencing Guideline § 3A1.4, which provides for sharp sentencing increases for any felony "that involved, or was intended to promote, a federal crime of terrorism." USSG § 3A1.4.  The effect of the enhancement is unequivocally severe, as its application maximizes a defendant's criminal history category to Category VI, and increases the offense level to a minimum of thirty-two.[2]  To display its effect, the enhancement's application in this case increases Defendant's guidelines range from 33 to 41 months to 210 to 262 months.

Defendant's offenses neither *directly* "involved" nor were "intended to promote" a federal crime of terrorism. Instead, the Government argues that § 3A1.4 applies because of Application Note 2 (hereinafter, "Note 2"), which states:

> an offense that involved (A) harboring or concealing a terrorist who committed a federal crime of terrorism (such as an offense under 18 U.S.C. § 2339 or 2339A); or (B) obstructing an investigation of a federal crime of terrorism, shall be considered to have involved, or to have been intended to promote, that federal crime of terrorism.

USSG § 3A1.4, comment. (n.2)(emphasis added).  Despite this expansive language, it appears that no court has ever applied the

---

[2]When a defendant's base offense level is higher than twenty, Section 3A1.4 provides for a twelve-level increase.  Otherwise, the offense level is increased to thirty-two.

enhancement for "obstructing an investigation of a federal crime of terrorism," and in only two such cases has the Government requested it.[3]

For an enhancement under Note 2 to be proper, the offense for which a defendant has been convicted must have involved [1] an "investigation of a federal crime of terrorism" and [2] "obstructing" that investigation.   The guidelines provide no guidance as to what constitutes "an investigation of a federal crime of terrorism" or "obstructing" within the meaning of this seemingly broad enhancement.  Accordingly, the Court must define the limits of these terms, and upon doing so, the Court will be able to decide whether the application of the enhancement is proper.

I.  . . . "**An Investigation of a Federal Crime of Terrorism**"

   **A.  The scope of "an investigation of a federal crime of terrorism" within § 3A1.4.**

To determine the scope of "an investigation of a federal crime of terrorism," the Court considered: (1) the definition of a "federal crime of terrorism" as incorporated into the guideline under 18 U.S.C. § 2332b(g)(5); (2) the text of § 3A1.4; and (3) the intended scope of § 3A1.4.  The Court concludes that, in determining whether the terrorism enhancement

---

[3]*United States v. Biheiri,* 356 F. Supp. 2d 589 (E.D. Va. 2005)(discussed *infra*); *United States v. Arnout,* 282 F. Supp. 2d 838, 846 (N.D. Ill. 2003)(enhancement denied because Note 2 only applies to offenses, not relevant conduct, and the defendant did "not stand convicted of an obstruction of justice offense.") *rev'd on other grounds,* 431 F.3d 994 (7th Cir. 2005).

should apply for obstructing an investigation under Note 2, the enhancement is only appropriate for obstructing investigations into *specific* offenses of terrorism, and not *general* terrorism investigations or intelligence gathering.

> 1. The definition of a "federal crime of terrorism" limits the enhancement's application to specific investigations

For purposes of the § 3A1.4, "federal crime of terrorism" has the meaning given that term in 18 U.S.C. § 2332b(g)(5), defined in the conjunctive as: "an offense that-- (A) is calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct; **and** (B) is a violation of . . . [a list of enumerated offenses]." Given these requirements for a "federal crime of terrorism," the enhancement's application therefore requires: (1) an investigation into one or more of the enumerated crimes listed in the statute; and (2) that the investigated crimes satisfy the motivational element, namely, that they are "calculated to influence or affect the conduct of government by intimidation or coercion." 18 U.S.C. § 2332b(g)(5)(B).

To determine whether the first requirement has been satisfied, the inquiry is simple. A court need only look to what offenses or crimes were contemplated by the grand jury or investigating agency to ensure that they are listed as one of the enumerated offenses under § 2332b(g)(5).

With respect to the motivational element, however, the inquiry is considerably more complex.  As conceded at sentencing, the Government must show that the potential violations that were the subject of the investigation were "calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct."  18 U.S.C. § 2332b(g)(5)(B).  In the context of an investigation into a specific offense, potential or completed, this requirement is of little consequence.  For investigations into specific offenses, such as a plot to bomb a government building with explosives, they are detailed by a discrete set of facts and circumstances.  Such facts and circumstances could include: who specifically was being investigated, what offense or offenses were the subject of the investigation, and what was the motivation for committing the offense.  In the context of an investigation into specific, discrete offenses, the Government would be able meet its burden by pointing to these specific facts and circumstances to demonstrate that the particular offenses subject of the investigation were "calculated to influence or affect the conduct of government."

However, in the context of a general, wide-ranging investigation, such demonstration is not possible.  In such an investigation, the Government cannot state with any degree of precision what potential violations they are investigating, but

it is simply hoping to gain information that would be potentially
helpful for intelligence or prosecutorial purposes in the United
States' ongoing struggle against terrorism.  If the Government
cannot point to any specific offenses that it is investigating,
it obviously cannot point to any facts or circumstances to show
whether those violations were "calculated to influence or affect
the conduct of government," and thus, it cannot meet its burden.[4]
Since the Government cannot meet this burden in a general
investigatory context, then it must also be concluded that
obstructing a general terrorism investigation cannot support the
proper application of the terrorism enhancement.  Therefore, the
enhancement's application is appropriate only by obstructing

---

[4]One potential argument against this reading is that, even in a general
terrorism investigation, the Government is investigating provisions of
material support to terrorists and terrorist organizations (in violation of 18
U.S.C. §§ 2339A and 2339B), and that such violations are *per se* "calculated to
influence or affect the conduct of government."  However, such a position is
inconsistent with the text and structure of § 2332b(g)(5).  Oft-cited in the
terrorism context, these two offenses not surprisingly are listed as
enumerated crimes in § 2332b(g)(5)(B).  This is the first condition that must
be satisfied to constitute a "federal crime of terrorism"  However, only when
a violation is **also** "calculated to influence or affect the conduct of
government" is that offense a "federal crime of terrorism" for the purposes of
the enhancement.  If Congress had intended for §§ 2339A and 2339B not to be
subject to the same requirements as all the other enumerated offenses with
which it is listed, then it would have listed them separately.  In direct
support of this conclusion is the recent decision by the Eastern District of
New York in *United States v. Awan*, No. CR-06-0154, 2007 U.S. Dist. LEXIS 51772
(E.D.N.Y., July 17, 2007).  In that case, the court found that a defendant
that had been convicted of two counts of conspiring to provide material
support in violation of § 2339A still did not warrant the terrorism
enhancement because the government could not show that his actions were
"calculated to influence or affect the conduct of government."  *Id.* at *17-19.
Therefore, a blanket government claim to be investigating violations of
providing material support to terrorists or terrorist organizations does not
dissolve the statutory requirements to constitute a "federal crime of
terrorism."

sufficiently specific investigations into particular offenses within a discrete set of facts.

> 2.   The text of § 3A1.4 also limits the enhancement's application to specific investigations

Section 3A1.4's text also supports the conclusion that an obstruction of a general terrorism investigation cannot support the proper application of the terrorism enhancement under Note 2.  First, Note 2 instructs that an offense that "involved . . . obstructing an investigation of a federal crime of terrorism, shall be considered to have involved, or to have been intended to promote *that* federal crime of terrorism."  USSG § 3A1.4 comment. (n.2)(emphasis added).  The phrase "*that* federal crime of terrorism" refers to a specific, single federal crime of terrorism.  By using "*that*," the Commission evidences its intent that the enhancement should only be applied when a defendant obstructs an investigation into a distinct, specific offense. (i.e., "*that*" distinct, specific federal crime of terrorism).  If the enhancement could be applied to the obstruction of a general, wide-ranging terrorism investigation with no specific offenses as a target, courts could not state with any particularity "*which*" federal crime of terrorism a defendant intended to promote.  *See, e.g., See United States v. Graham*, 275 F.3d 490, 516 (6th Cir. 2002)(holding that a district court must identify with particularity which "federal crime of terrorism" a defendant intended to promote).

-9-

Second, within § 3A1.4, every reference to "federal crime of terrorism" is made in the singular form--"a federal crime [not crimes] of terrorism,"--referring to "a" single crime, and thus contemplating a discrete, specific offense, whether already completed or potential.  If, however, the guideline stated "federal crimes of terrorism," the argument for the enhancement's application to general terrorism investigations would be considerably strengthened.

In sum, the Court finds that § 3A1.4's text does not permit the enhancement for obstructing a general, nebulous terrorism investigation or intelligence gathering, but instead requires sufficiently specific investigations into particular offenses.

3.  The Intended Scope of § 3A1.4

Although the Court came to this conclusion independently as a result of the analysis stemming from the text of 18 U.S.C. § 2332b(g)(5) and § 3A1.4, the result also comports with the Commission's intent.

The grand jury is an essential, powerful investigatory tool in our administration of justice.  *Unites States v. Calandra*, 414 U.S. 338, 343 (1974).  In some instances, the grand jury is used to investigate a specific act of misconduct revolving around a discrete set of facts.  In other instances, the grand jury is used to receive information to aid in ongoing

investigation with no foreseeable end in sight, for instance, to gather intelligence about a group that is known to be hostile to the United States and its allies.  Both uses are entirely proper, necessary, and effective.  However, if this enhancement can be applied in these far-ranging, ongoing investigations, then its application becomes unquestionably boundless.  For an enhancement that results in a twelve-level increase and Criminal History of VI *at best*, such a result could not be intended.  The Court's reading of Note 2 prevents such abuse of the enhancement, precluding its use as an over-inclusive sledgehammer in investigations that may have the faintest whiff of being terrorism-related.

In sum, based upon the text of § 3A1.4 and its interplay with § 2332(b)(g)(5), a sufficiently specific investigation into particular offenses is required to support a proper usage of the terrorism enhancement under Application Note 2 of the guideline.

### B.  Whether the investigation in which Defendant was questioned was an "investigation of a federal crime of terrorism" within the meaning of § 3A1.4

Having properly determined the scope of an "investigation of a federal crime of terrorism," the Court turns to the enhancement's potential application to Defendant.  For the reasons that follow, the Court finds the investigation in which Defendant was questioned to be sufficiently specific to

constitute an "investigation of a federal crime of terrorism" as contemplated by § 3A1.4.

> 1.  The offenses that were the subject of the investigation are 2332(b)(g)(5) enumerated offenses.

        The Government asserts that Defendant was questioned in the course of an investigation of violations of 18 U.S.C. §§ 2339A and 2339B--offenses that relate to providing material support to terrorists and terrorist organizations and are specifically enumerated in the statute.  Additionally, the superseding indictment specifically alleges that the grand jury before which Defendant testified was "conducting an investigation to determine whether violations of . . . Title 18, United States Code, Sections . . . 2339A, or 2339B had been committed, and to identify the persons who had committed . . . such violations." (Superseding Indictment at 1).  Finally, the evidence at trial established that allegations of material support to terrorists or terrorist organizations were within the scope of the investigation.  Therefore, the Government has demonstrated that the investigation was focused on one of the enumerated offenses listed in § 2332b(g)(5).

> 2. The offenses that were the subject of the investigation satisfy the motivational element.

        With respect to the motivational element, the Government must prove by a preponderance of the evidence that the potential violations being investigated were "calculated to

influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct."  18 U.S.C. § 2332b(g)(5).  As stated above, implicit in this requirement is that the investigation be sufficiently specific because, in a general investigation, the Government cannot carry its burden to satisfy the motivational element.

The critical question upon which this issue turns can therefore be articulated as follows: was the investigation in this case of specific, discrete offenses such that the Government can meet its burden to prove that those crimes were "calculated to affect the conduct of government?"  Or, was it more representative of a far-ranging general investigation in which the Government sought information possessed by Defendant about Lashkar-e-Taiba?  The question is admittedly close, and the Court has no delusions of this case resembling either end of the spectrum: an investigation into a single, discrete offense or a blind "fishing" expedition.

At trial, at sentencing, and elsewhere in its pleadings, the Government has enumerated specific, potential violations that were also part of the investigation.  In the same investigation in which Defendant was questioned, eight individuals to whom he was connected went to foreign jihad training camps and one was convicted of soliciting treason to

fight against the United States.[5]  Additionally, the Government was able to secure their cooperative testimony leading to convictions for specific terrorist acts in Australia, France, and England.  Most notable, however, is that, at the time Defendant was questioned, Ali Al-Timimi and Ahmed Abu-Ali were yet to be indicted, and were under investigation for Conspiracy to Levy War against the United States and Conspiracy to Assassinate the President of the United States, respectively.  Defendant had relationships with both.  Defendant frequented Dar al-Arqam when al-Timimi was speaking and had sought his advice and counsel.  Additionally, Defendant made a speech on at least one occasion at the Dar al-Arqam Mosque during Al-Timimi's lecture series: "Signs Before the Day of Judgment."  Additionally, evidence demonstrates that Defendant had met Abu-Ali in Northern Virginia and also studied together in Saudi Arabia.  In this investigation, the Government sought any information regarding Al-Timimi and Abu-Ali in addition to other persons that would be helpful in the prosecution for the specific offenses for which they were being investigated.[6]

---

[5]Defendant was originally listed as a co-defendant with these individuals, but was granted a severance by Judge Brinkema.  The Court views this severance as a recognition that Defendant was not as integral to this group as the Government asserts.  However, contrary to the position by defense counsel, the Court does not find this severance is the equivalent of a declaratory judgment that Defendant had no affiliation with this group at all.

[6]It has been established that Defendant attended numerous lectures by Ali Al-Timimi and studied in Saudi Arabia with Ahmed Abu-Ali.

However, militating against the specificity of the investigation is the Government's concession of the investigation's far-ranging scope:

> Proof at trial established that the investigation into the identities of the individuals who attended foreign terrorist camps operated by Lashkar-e-Taiba was of intense importance so that the FBI could assist in the investigation of terrorist plots around the world. Proof further established that information provided to the investigators by individuals who attended those camps was used in the investigation and prosecution of individuals in England, France, and Australia for terrorism offenses.

(Govt. Brf., 7). This description of the investigation by the Government depicts it as a type of wide-casting global pursuit of "terrorist plots" and "terrorism offenses." Such a broad description clearly weighs in favor of this Court finding this investigation too general for the Government to possibly demonstrate that these offenses were calculated to influence or affect the conduct of government.

Ultimately, the Court recognizes the investigation's duality. It sought both information about terrorism offenses and terrorism plots throughout the world, but also targeted specific individuals and specific offenses potentially committed by those individuals. After thoroughly considering these facts and circumstances surrounding the investigation's scope, the Court is satisfied with the specificity of the investigation in which Defendant was questioned.

-15-

To satisfy its burden, the Government has indicated the specific facts and circumstances surrounding the targeted offenses to demonstrate they were "calculated to influence or affect the conduct of government." Specifically, the investigation involved persons affiliated with al-Qaeda and Lashkar-e-Taiba (an organization known to provide aid to al-Qaeda). These persons were being investigated for potential commissions of conspiracy to levy war against the United States, soliciting treason against the United States, and conspiracy to assassinate the President of the United States. Such offenses against the United States are within the "enumerated offenses" of § 2332b(g)(5) and are directed to influence or affect the conduct of the United States government by intimidation or coercion, or to retaliate against the government of the United States. Accordingly, the Court concludes that the investigation in which Defendant was questioned was "an investigation of a federal crime of terrorism" within the meaning of § 3A1.4.

## II.  "Obstructing" . . .

### A.  The Scope of "Obstructing . . ."

Despite the paucity of case law with respect to the terrorism enhancement and the application of Note 2, this Court has already addressed the bounds of the term "obstructing" under § 3A1.4 in *United States v. Biheiri,* 356 F. Supp. 2d 589 (E.D. Va. 2005) *("Biheiri III")*.  In *Biheiri III,* the government

-16-

sought the terrorism enhancement in the obstruction context
after two previous failed attempts.  *See United States v.
Biheiri*, 299 F. Supp. 2d 599 (E.D. Va. 2004); *United States
Biheiri*, 341 F. Supp. 2d 593 (E.D. Va. 2005).  In the third
attempt, the government argued that the defendant obstructed a
terrorist-financing investigation by lying about his
relationship with an individual named Marzook that was
affiliated with a terrorist organization.  *Biheiri III*, 356 F.
Supp. 2d at 598.  The disputed issue in the enhancement's
application was "whether § 3A1.4 requires a showing that actual
obstruction or merely the attempt to obstruct."  *Id.*

        This Court held that "the plain language of § 3A1.4
makes clear that actual obstruction is required."  *Id.*  Since §
3A1.4 omits any mention of an attempt to obstruction, unlike the
general obstruction of justice enhancement (§ 3C1.1) and the
federal obstruction of justice statute (18 U.S.C. § 1503), an
attempt to obstruct an investigation is not enough.  *Id.*
Therefore, to receive an enhancement under § 3A1.4, the
government must show that defendant actually obstructed an
investigation of a federal crime of terrorism.

### B.  Whether Defendant actually obstructed the investigation

        Given that actual obstruction is required, the
question is whether the Government has shown by a preponderance
of the evidence that a defendant's false statements actually

obstructed the investigation in which he was questioned.  In *Bihieri,* the government argued that the agents were unaware of the financial relationship between the defendant and Marzook, and had he not lied about this relationship, the government would have made additional inquiries and more quickly discovered assets infused to a terrorist organization.  *Id*. at 599.  The Court did not accept this argument, stating that the enhancement would not apply because the agents who interviewed the defendant had actual knowledge of defendant's relationship with Marzook, and thus, any reliance on this statement was unreasonable.  *Id*.

In this case, to prove actual obstruction, the Government submits testimony that the FBI investigation sought information regarding: (1) the Northwest Frontier Province of Pakistan; (2) the Lashkar-e-Taiba training camps; (3) specific individuals believed to have participated in jihad training camps; and (4) specific individuals believed to have aided others in obtaining jihad training.  The Government contends that Defendant's false statements hindered and impeded the FBI's ability to discover details about Lashkar-e-Taiba training camps, including facilitators, attendees, trainers, training techniques, curriculum, and locations.  *See* (Decl. of Agent Kneisler)*.*  Finally, Defendant lied about his activities while in Pakistan, as he represented that he spent five days at a facility in Islamabad that was affiliated with the American

Embassy.  After expending significant resources, the Government was able to affirmatively prove that Defendant never attended any such center, and that he was unaccounted for during this period of time.  *Id.*

The Court finds that these false statements actually obstructed the Government's investigation.  At trial, the jury found beyond a reasonable doubt that Defendant made false or misleading statements with respect to his participation at a jihad training camp as well as the identity of individuals with whom he had interacted that were thought to have ties to jihad training camps.  Unlike *Bihieri*, where the Government was already aware of the information that it sought, the Government did not know the details about Lashkar-e-Taiba training camps, training techniques, curriculum, and locations.  Additionally, because of Defendant's false or intentionally misleading answers, the Government still does not know the identity or whereabouts of the persons about whom Defendant was questioned, their involvement with Lashkar-e-Taiba, and their role in aiding persons to obtain jihad training.  Since Defendant gave false and misleading answers in the investigation, and the Government did not, and in some cases, still does not, possess the specific information which it sought, the Court concludes that Defendant actually obstructed the FBI's investigation.

In conclusion, Defendant actually obstructed the investigation at the heart of this case, and that investigation was of a federal crime of terrorism.  Accordingly, Defendant will receive an enhancement under § 3A1.4, which increases his offense level by twelve and maximizes his criminal history at category VI.  As a 32, VI, this yields a guideline range of 210 to 262 months.

## **Whether a Departure or Variance is Warranted**

Having properly determined the applicable guidelines range for Defendant, the Court will now "determine whether a sentence within that range . . . serves the factors set forth in § 3553(a) and, if not, select a sentence [within statutory limits] that does serve those factors." *United States v. Moreland*, 437 F.3d 424, 432 (4th Cir. 2006). In determining a sentence outside the advisory guidelines range, a court should first consider "whether a departure is appropriate based on the Guidelines Manual or relevant case law. *Id.* "If an appropriate basis for departure exists, the district court may depart." *Id.* If the resulting range still does not serve the factors set forth in § 3553(a), the court may impose a non-guidelines sentence, also known as a variance sentence, but must articulate the reasons for the sentence imposed. *Id.* It is under this multi-step framework that the Court will proceed in its analysis.

The Court finds that, for reasons that stated below, a sentence within Defendant's guideline range would not serve the factors set forth in § 3553(a). Accordingly, the Court must first determine whether a departure is appropriate based on the guidelines. *Moreland*, 437 F.3d at 432 (4th Cir. 2006). If not, the Court may grant a variance sentence based upon the factors set forth in § 3553(a).

-21-

### I.   A Downward Departure is Appropriate Under § 4A1.3

United States Sentencing Guideline § 4A1.3 provides that a court may downward depart "if reliable information indicates that defendant's criminal history category substantially over-represents the seriousness of the defendant's criminal history or the likelihood that the defendant will commit other crimes."  USSG § 4A1.3.  At sentencing, the Government objected to a § 4A1.3 downward departure on the grounds that it was inconsistent with the application of the terrorism enhancement.  The Government argued that since the enhancement specifies a criminal history category of VI, irrespective of a defendant's actual criminal history score, it removes the discretion of the Court to downward depart on the basis of his criminal history.  For the following reasons, the Court disagrees.

First, no text within § 4A1.3 restricts or prohibits its application after the application of the § 3A1.4 enhancement.  Several guidelines other than 3A1.4 prescribe specific criminal history categories such as: § 4B1.1 ("career offenders" are category VI); § 4B1.4("armed career criminals" are category IV at minimum); and § 4B1.5("repeat and dangerous sex offenders" are category V at minimum).  Notably, § 4A1.3 explicitly restricts or prohibits its application in the event that one of these other guidelines apply.  Specifically, § 4A1.3

-22-

prohibits a downward departure in the cases of armed career criminals under § 4B1.4 and repeat sex offenders under § 4B1.5, and limits downward departures to one category at most in the case of a career offender.  Unlike with the other guidelines that specify a criminal history category, § 3A1.4 is listed nowhere in the guideline or its application notes.  Without any prohibition or limitation, it is clear that the Commission did not intend to restrict a court's discretion with respect to criminal history downward departure under § 3A1.4.

In addition, although the Fourth Circuit has not had the opportunity to address this issue, the Second Circuit recognizes a court's discretion to downward depart on the basis of criminal history after the application of the terrorism enhancement.  In *United States v. Meskini*, the court held that "[a] judge determining that § 3A1.4(b) over-represents the seriousness of defendant's past criminal conduct or the likelihood that defendant will commit other crimes always has the discretion under § 4A1.3 to depart downward in sentencing." 319 F.3d 88, 92 (2nd Cir. 2003).  Therefore, despite § 3A1.4's provision of a uniform criminal history category, a court may still vary from that category based upon the concerns in § 4A1.3.[7]

---

[7] *See also United States v. Thurston,* 2007 U.S. Dist. LEXIS 38185, at *53 (D.Or., May 21, 2007)(stating in dicta that "even if § 3A1.4 is deemed to apply and raises defendant's criminal history category to VI, the court retains discretion to depart downward" under § 4A1.3).

Since a court retains discretion to depart under § 4A1.3 despite the application of § 3A1.4, the Court will now consider whether a departure is appropriate. "A departure pursuant to § 4A1.3 is encouraged, provided that the criminal history category does not account adequately for the defendant's past criminal conduct or the likelihood that he will commit other crimes." *United States v. Dixon,* 318 F.3d 585, 588 (4th Cir. 2003). For the reasons that follow, this Court finds that, Defendant's guideline range independently warrants a downward departure on either ground.

### A.   The seriousness of Defendant's criminal history

After applying § 3A1.4, Defendant's criminal history is maximized at category VI. For an individual with no criminal record and no evidence of ever having committed an illegal act in his life outside of the conduct for which he is convicted, this clearly over-represents the seriousness of his criminal history.[8]

### B.   The likelihood that Defendant will commit other crimes

Defendant's criminal history of VI also over-represents the likelihood that Defendant will commit other crimes. In *Meskini*, the Second Circuit recognized the "rational

---

[8]The Court realizes that this analysis in this section is somewhat short. However, in light of the complete absence of criminal history, there is very little to discuss as to whether a category VI over-represents the seriousness of his criminal history.

-24-

basis for creating a uniform criminal history category for all *terrorists* under § 3A1.4(b), because even *terrorists* with no prior criminal behavior are unique among criminals in the likelihood of recidivism, the difficulty of rehabilitation, and the need for incapacitation." 319 F.3d at 92. However, Sabri Benkahla is not a terrorist. He does not share the same characteristics or the conduct of a terrorist, and in turn, he does not share the same likelihood of recidivism, the difficulty of rehabilitation, or the need for incapacitation.

Again, outside of this case, Defendant has not committed any other criminal acts and there is no reason to believe he would ever commit another crime after his release from imprisonment. Defendant has engaged in model citizenry, receiving a Master's degree from The Johns Hopkins University, volunteering as a national elections officer in local, state, and national elections, and demonstrating his dedication to his four-year-old son. It is clear that, in the case of the instant defendant, his likelihood of ever committing another crime is infinitesimal.

Based upon these concerns, the Court finds that Defendant is the quintessential candidate for a downward departure under § 4A1.3. The Court finds that a criminal history category of I most accurately represents Defendant's seriousness of criminal history and his risk of recidivism.

Accordingly, at an offense level 32 and a category I, Defendant will be placed within a guideline range of 121 to 151 months, and will be sentenced to 121 months.

## II.   In the Alternative, A Variance Sentence is Necessary to Serve the Factors Set Forth in § 3553(a)

Even if a departure under § 4A1.3 is not warranted or appropriate, this Court makes a finding in the alternative that a variance sentence is necessary to serve the factors set forth in § 3553(a).  Section 3553(a) provides that a court shall impose a sentence "sufficient, but not greater than necessary" to reflect the seriousness of the offense, promote respect for the law, provide just punishment, afford adequate deterrence, protect the public from further crimes, and provide adequate treatment to the defendant.  18 U.S.C. § 3553(a)(2).  After a deliberate and careful consideration of all the 3553 factors, this Court holds that a sentence of 210 months is greater than necessary, and will instead impose a sentence of 121 months. In coming to this conclusion, the Court considered numerous factors:

### A.   The Nature and Circumstances of the Offense and the History and Characteristics of the Defendant

Section 3553(a) directs a court, in determining a particular sentence to be imposed, to consider "the nature and circumstances of the offense and the history and characteristics of the defendant."  18 U.S.C. § 3553(a)(2).  The evidence at

-26-

trial clearly established that Defendant lied to the grand jury and an FBI agent, and in turn, this obstructed a terrorism investigation.  As to the motivation for his untruthfulness, this Court is unsure.  Defendant may have been motivated out of a desire not to be seen as involved with illegal activities.  He may have been concerned about potential hardship he might cause others.  He may have been embarrassed of his own conduct. Nevertheless, the Court does not believe Defendant had the willful intent to promote an act of terrorism.  Section 3A1.4 may make no distinction between an individual that directly promotes a federal crime of terrorism and an individual that obstructs an investigation into a federal crime of terrorism, but to the contrary, this Court does.  To do otherwise would be to act in complete disregard of the § 3553(a) factors and principles of proportionality.

Furthermore, although Defendant "actually" obstructed the investigation, and the Government still does not have information about some of the individuals it was investigating, the extent of Defendant's actual obstruction was hardly devastating to the investigation.  Defendant was not the lynchpin in any organization or conspiracy being investigated, and the Government still achieved successful prosecutions of multiple persons with whom Defendant was affiliated.

Finally, the Court is unaware of any case in which a defendant has received 210 months (17.5 years) for lying to a grand jury and an FBI agent.  Convictions for obstruction of justice and false declarations routinely lead to considerably lesser sentences of imprisonment.[9]  This is likely because the nature of making false statements is not considered as serious a crime as the Defendant's guideline range indicates.  Therefore, the nature and circumstances of Defendant's criminal conduct clearly weigh heavily in favor of a sentence outside Defendant's guideline range.

As to the history and characteristics of the Defendant, as stated above, it appears that Defendant has never committed any criminal act outside the context of this case.  He is an American citizen, born and raised in Northern Virginia.  He attended a local high school and college, excelling at both, and received a Master's degree at The Johns Hopkins University.  He has a significant number of strong, positive relationships with friends, family, and the community.  In fact, the Court received more letters on Defendant's behalf than any other defendant in twenty-five years, all attesting to his honor, integrity, moral character, opposition to extremism, and devotion to civic duty.  With respect to Defendant's history and

---

[9]And in some cases, no imprisonment at all. *See, e.g., United States v. Libby*, 2007 U.S. Dist. LEXIS 49964 (D.D.C., July 12, 2007).

-28-

characteristics, this factor weighs strongly in favor of a sentence outside the guideline range.

### B.  The Need for the Sentence Imposed

Also under § 3553(a), a sentencing court shall impose a sentence sufficient, but not greater than necessary, to (1) reflect the seriousness of the offense; (2) promote respect for the law; (3) provide just punishment; (4) afford adequate deterrence; (5) protect the public; and (6) provide the defendant with treatment (which is not at issue here).  18 U.S.C. § 3553(a)(2).

At Defendant's sentencing hearing, the Government's position was that a sentence of anything less than 210 months was inadequate to serve these goals.  The Court cannot agree. To serve 210 months for the false statements made by Defendant, without the intent to promote a crime of terrorism and without any evidence that his obstruction caused any tangible harm to others, is simply more than necessary to achieve these goals. Ten years' imprisonment for lying to a grand jury and making false statements to an FBI agent clearly reflects the seriousness of the offense, promotes respect for the law, provides sufficient punishment, and affords adequate deterrence. Additionally, considering Defendant's negligible likelihood of recidivism, there is little concern to protect the public from any further crimes.  Accordingly, considering this Defendant and

-29-

the specific conduct for which he was convicted, a sentence of 121 months is clearly sufficient to achieve these goals.

## C.  The Need to Avoid Unwarranted Sentence Disparities Among Similarly Situated Defendants

Additionally, Section 3553 (a)(6) requires a sentencing court to consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."  18 U.S.C. § 3553(a)(6).  In the instant case, the sentences of Defendant's previous co-defendants weighs heavily in favor of a variance.[10]

A sentence of 210 months for Defendant's convicted conduct would clearly result in an unwarranted sentencing disparity.  After a review of the other sentences resulting from this investigation, numerous defendants received similar or even lesser sentences for significantly more severe, violent offenses.  Donald Surratt pled guilty to Conspiracy to Commit an Offense Against the United States, and received a sentence of forty-six months' imprisonment.  Hammad Abdur-Raheem was found guilty at trial for Conspiracy to Contribute Material Support to Lashkar-e-Taiba and Conspiracy to Possess and Use Firearms in

---

[10]As this Court previously held in *United States v. Doan*, No. 1:06cr463, 2007 U.S. Dist. LEXIS 42834 (E.D. Va., March 12, 2007), § 3553(a)(6) permits co-defendant sentencing comparisons and does not require that the analysis be limited to similarly situated defendants nationwide.  However, even if § 3553(a)(6) required a nationwide view, such a comparison would be unhelpful in this situation since it appears that, before this case, no defendant has ever received an enhancement under § 3A1.4 for obstructing an terrorism investigation.

Connection with a Crime of Violence, and received ninety-seven months' imprisonment.  Muhammed Aatique pled guilty to Aiding and Abetting Commencing an Expedition Against a Nation Friendly with the United States, and Use and Discharge of a Firearm During and In Relation to a Crime of Violence, and received 126 months' imprisonment.  Yong Ki Kwon pled guilty to Conspiracy to Commit an Offense Against the United States and Transfer of a Firearm for Use in a Crime of Violence, and received a sentence of 138 months' imprisonment, later significantly reduced for cooperation.  Ibrahim Ahmed Al-Hamdi pled guilty to Possession of a Firearm during an in Relation to a Crime of Violence, and received 180 months imprisonment.  Finally, Khwaja Mahmood Hasan pled Guilty to Conspiracy to Commit a Crime against the United States and Use and Discharge of a Firearm in Relation to a Crime of Violence, and received 135 months' imprisonment.

In comparing the criminal conduct and the respective sentences for these persons to Defendant's criminal conduct and his properly conducted guideline range, the disparity is staggering.  These persons all committed and were convicted of more dangerous and more violent offenses than Defendant, but none received a sentence as severe as his guideline range suggests.  Accordingly, the Court finds this factor weighs in favor of a variance to the greatest degree.

**D.  Other § 3553(a) Factors**

After considering the remaining factors under § 3553(a), the Court finds that they neither weigh in favor of nor against a departure or variance in Defendant's sentence.  *See United States v. Johnson*, 445 F.3d 339, 345 (4th Cir. 2006)(a district court need not "explicitly discuss every § 3553(a) factor on the record.")

In sum, the Court is unable, in good conscience, to hold that a sentence of 121 months, or ten years, fails to reflect the seriousness of the offense, fails to promote respect for the law, fails to provide just punishment, fails to afford adequate deterrence, and fails to protect the public.  It is upon this inability that the Court's decision firmly rests.  How an additional eighty-nine months' incarceration will achieve these goals when ten years will not, this Court cannot articulate.  To hold otherwise, this Court would be forced to admit to "unreasonableness"--the very standard against which this sentence is ultimately judged.  *See United States v. Hughes*, 401 F.3d 540, 546-47 (4th Cir. 2005).

## **Conclusion**

For the foregoing reasons, the Court finds that Defendant will receive a sentencing enhancement pursuant to § 3A1.4, thereby yielding a guideline range of 210 to 262 months. However, the Court finds this guideline range does not adequately serve the factors set forth in 18 U.S.C. § 3553(a). Given that a downward departure is appropriate under § 4A1.3, the Court will provide Defendant with a criminal history category of I, resulting in a guideline range of 121 to 151 months, and sentence Defendant to 121 months' imprisonment.  In the event that a downward departure should be found to be inappropriate, the Court finds in the alternative that a variance is necessary to serve the factors under § 3553(a), and will impose a sentencing range of 121 months.


August 3rd, 2007            _____/s/_____
Alexandria, Virginia                James C. Cacheris
                            UNITED STATES DISTRICT COURT JUDGE